## BJORNQUIST v. BOSTON & A. R. CO.

(Circuit Court of Appeals, First Circuit. June 21, 1918.)

No. 1338.

1. APPEAL AND ERROR ⟨⟩171(3)—PRESERVATION OF GROUND OF REVIEW—JURISDICTION—PLEAS IN ABATEMENT.

Under Rev. Laws Mass. 1902, c. 173, §§ 18, 19, questions of jurisdiction must be raised by plea or answer in abatement; however, evidence relating to the question of jurisdiction having been admitted at the trial, a case on appeal will be treated as though a plea in abatement had been filed.

2. COURTS ⟨⟩280—FEDERAL JURISDICTION—BURDEN OF PROOF.

Where a declaration alleges all the facts essential to federal jurisdiction, the burden of proving lack of jurisdiction falls on the defendant.

3. COURTS ⟨⟩307(1)—JURISDICTION—DIVERSITY OF CITIZENSHIP—DOMICILE OF INFANT.

A minor, having reached years of discretion and having no parents, grandparents, or statutory guardian, may establish a domicile anywhere for the purpose of federal jurisdiction.

4. COURTS ⟨⟩307(1)—FEDERAL COURTS—JURISDICTION.

Domicile is the test of citizenship for the purpose of the jurisdiction of the courts of the United States.

5. RAILROADS ⟨⟩276(1)—TRESPASSERS—DUTIES OF RAILROAD.

A railroad in Massachusetts owes a trespasser on its trains no duty of protection, and need refrain only from willfully, recklessly, or wantonly exposing him to injury.

6. NEGLIGENCE ⟨⟩136(9)—WILLFUL CONDUCT—QUESTION FOR JURY.

In case involving willful negligence, if on the evidence fair-minded men might differ, the case should be submitted to the jury.

7. MASTER AND SERVANT ⟨⟩332(1)—INJURIES TO THIRD PERSONS—SCOPE OF AUTHORITY.

In action against master for negligence of servant, if on the evidence, concerning the scope of authority of the servant, fair-minded men might differ, the case should be submitted to the jury.

8. RAILROADS ⟨⟩282(10)—TRESPASSERS ON TRAIN—JURY QUESTION.

In an action by an infant against a railroad for injuries received while trespassing on defendant's train, whether the threat of a trainman to break plaintiff's neck if he did not get off was the cause of the injury held for the jury.

9. RAILROADS ⟨⟩282(10)—INJURIES TO TRESPASSER—SCOPE OF AUTHORITY—QUESTION FOR JURY.

In an action by a trespasser on a tank car, which had been kicked loose from the engine, for negligence of a trainman thereon, whether the trainman was acting within the scope of his authority in threatening to break the trespasser's neck if he did not get off held for the jury.

In Error to the District Court of the United States for the District of Massachusetts; Jas. M. Morton, Judge.

Action by Charles J. Bjornquist, by next friend against the Boston & Albany Railroad Company. Judgment for defendant, and plaintiff brings error. Judgment vacated, verdict set aside, and case remanded for further proceedings.

Action of tort, originally commenced in the superior court for the county of Suffolk, by writ dated January 22, 1900, for injuries sustained on August

12, 1899, in consequence of the plaintiff jumping from a freight car of the defendant, owing to a brakeman "hollering" to him to "get off there or I'll break your neck," but no battery was committed on the plaintiff by the brakeman. The plaintiff, in jumping, got under the car and suffered the loss of his legs. The case was tried in the state court to Harris, J., and a jury, and a verdict was returned for the plaintiff, and damages assessed in the sum of $22,000. The case was subsequently taken, on defendant's exceptions, to the Supreme Judicial Court for the commonwealth, and that court held, as matter of law, that the plaintiff was not entitled to recover, that a verdict should have been ordered for the defendant, and sustained the defendant's exceptions. No further proceedings were had in the state court. See Bjornquist v. Boston & Albany R. R. Co., 185 Mass. 130, 70 N. E. 53, 102 Am. St. Rep. 332.

Subsequently the plaintiff, after the death of his parents in Massachusetts, went to live with an aunt in the state of Maine, and while residing there he brought suit, for the same cause of action, in the United States District Court for the District of Massachusetts, by writ dated April 17, 1911, and trial was had to Morton, J., and a jury. At the close of the evidence the court ordered a verdict for the defendant, and the plaintiff seasonably excepted. The case was subsequently argued, on plaintiff's exceptions, to the United States Circuit Court of Appeals for the First Circuit, and the plaintiff's exceptions were sustained.

Samuel A. Fuller and Charles Toye, both of Boston, Mass. (Bernard J. Killion, of Boston, Mass., on the brief), for plaintiff in error.

Lowell A. Mayberry, of Boston, Mass. (George L. Mayberry and George P. Furber, both of Boston, Mass., on the brief), for defendant in error.

Before BINGHAM and JOHNSON, Circuit Judges, and HALE, District Judge.

BINGHAM, Circuit Judge. This is an action of tort for personal injuries sustained by the plaintiff through the alleged willful, reckless, and wanton conduct of the defendant, its agents, and servants.

[1, 2] The defendant filed a plea in abatement, setting forth the pendency of a prior suit for the same cause of action in the superior court for the county of Suffolk and commonwealth of Massachusetts. It also filed an answer, denying each and every allegation of the plaintiff's writ and declaration, and each and every count thereof, and further alleged that the plaintiff was guilty of negligence which contributed to his injury. No plea in abatement or answer in abatement, setting forth that the plaintiff was a citizen and resident of Massachusetts, was filed. Under the practice in Massachusetts, the question of jurisdiction must be raised either by a plea in abatement or an answer in abatement. Rev. Laws 1902, c. 173, §§ 18, 19. And it is held that a plea to the merits waives all matters in abatement not taken in a plea or an answer in abatement. Craig Silver Co. v. Smith, 163 Mass. 362, 39 N. E. 1116. The plaintiff in his declaration alleged all the facts essential to federal jurisdiction. The allegation of these facts, prima facie, was true. If the defendant had filed a plea in abatement or an answer in abatement, it would have been necessary to have averred therein that the plaintiff was a citizen of the commonwealth of Massachusetts, and under that plea the burden of proof would have fallen upon the defendant. Adams v. Shirk, 117 Fed. 801, 895, 55 C. C. A. 25. Evidence, however, relating to the question of jurisdiction hav-

ing been admitted at the trial, we think we should consider the case as though a plea in abatement or an answer in abatement raising the jurisdictional question had been filed. The burden of proof, however, still remains on the defendant on this issue.

The decisions in Lindsay-Bitton Live Stock Co. v. Justice, 191 Fed. 163, 111 C. C. A. 525, Roberts v. Lewis, 144 U. S. 653, 12 Sup. Ct. 781, 36 L. Ed. 579, and C., B. & Q. Ry. Co. v. Willard, 220 U. S. 413, 31 Sup. Ct. 460, 55 L. Ed. 521, are not applicable, as the practice prevailing in the jurisdictions in which they arose differs materially from that in Massachusetts.

The accident occurred on the 12th of August, 1899. The plaintiff was born at Worcester, Mass., April 29, 1891. He lived there up to the time of his mother's death, when he moved to Cambridge with his father, who died shortly thereafter. In the latter place he lived with his uncle, Alfred Wiggin, for about 5 years. It was while he was living in Cambridge that the accident occurred. Shortly after the accident his uncle moved to Arlington Heights, and the plaintiff continued to live with him until 1910. He then went to Maine to live with an aunt, intending to make his permanent home there. He was at this time 19 years old. He remained in Maine until the fall of 1912. The present action was brought April 17, 1911, while he was residing in that state. In the fall of 1912 his aunt and her husband left Maine and moved to Massachusetts, and he returned there with them.

In the District Court the jury was directed to return a verdict for the defendant. The plaintiff excepted, and this writ of error was prosecuted.

[3] The defendant contends that, on the facts above stated, the District Court was without jurisdiction to entertain the action; that, the plaintiff having been born in Massachusetts, and his parents having been domiciled there at the time of their death, his residence and domicile continued during his minority to be in Massachusetts, notwithstanding his removal to Maine, and, the action having been brought before he reached his majority, the requisite diversity of citizenship was wanting, to confer jurisdiction on the District Court.

It is undoubtedly true that the general rule is that a minor is incapable of changing his domicile and acquiring a new one during his minority; that he has the domicile of his father, if living, and, if he is dead, that of the mother (Lamar v. Micou, 112 U. S. 452, 5 Sup. Ct. 221, 28 L. Ed. 751); that, if both father and mother are dead, by taking up his residence with his grandfather, or, if he is dead, with his grandmother, he may, in that way, acquire a domicile (Lamar v. Micou, 114 U. S. 218, 222, 5 Sup. Ct. 857, 29 L. Ed. 94).

The reason stated for the general rule is that a minor is non sui juris, which no doubt, as here applied, means that a person who is under the power and authority of another possesses no right to choose a domicile. Hart v. Lindsey, 17 N. H. 235, 43 Am. Dec. 597. Under the common law the father is the natural guardian of the minor, and entitled to his custody and control until he reaches majority; and the same is true of the mother (the father having died), and, if she

is dead, of the grandfather. When either stands in the relation of natural guardian to the minor, he or she may change the domicile of the minor to another place within or without the state of his previous domicile. 14 Cyc. 843, 844. It would seem, however, that this doctrine of natural guardianship has never been extended to uncle or aunt, when they stand as next of kin to the minor. Munday v. Baldwin, 79 Ky. 121; Hiestand v. Kuns, 8 Blackf. (Ind.) 345, 46 Am. Dec. 481.

When the plaintiff went to Maine he was 19 years old. At that time he had neither father nor mother, nor, so far as appears, grandparents, living. The uncle with whom he had been living in Massachusetts was unable and apparently unwilling further to maintain a home for him. In this situation he determined to go to Maine and make his permanent home there with his aunt; and the question is whether a minor of his years of discretion may, under these circumstances, acquire a new domicile, or whether he is restricted to the domicile of his father at the time of his death.

None of the cases which have come to our attention have gone to the extent of holding that, under such circumstances, a minor who has attained years of discretion may not acquire a new domicile. In all of them, where it has been held that the minor may not acquire a new domicile of his own volition, it has appeared that he was of immature years, or that he was subject to the direction and control of a person standing in the position of a natural or statutory guardian. See Glos v. Sankey, 148 Ill. 536, 36 N. E. 628, 23 L. R. A. 665, 39 Am. St. Rep. 196; In re Benton, 92 Iowa, 202, 60 N. W. 614, 54 Am. St. Rep. 546; Sudler v. Sudler, 121 Md. 46, 88 Atl. 26, 49 L. R. A. (N. S.) 860, and note, Ann. Cas. 1913C, 1191; Churchill v. Jackson, 132 Ga. 866, 64 S. E. 691, 49 L. R. A. (N. S.) 875, and note, Ann. Cas. 1913E, 1203.

In Russell v. State, 62 Neb. 512, 87 N. W. 344, Estler, a minor, 20 years and 5 months old, who up to that time had had his domicile in the state of New York, was emancipated by his father and went to Nebraska to make his permanent home. The question was whether, having been emancipated and freed from the power and authority of his parents, he could acquire a domicile apart from theirs. The question arose in an indictment for murder. Having resided 8 months in Nebraska, Estler was called as a juror in the case. He became of age August 21, 1900, a month preceding the trial. By section 657 of the Civil Code of Procedure of that state male persons over the age of 21 years, having the qualifications of electors, were made competent as jurymen. To constitute one a qualified voter he had to be 21 years of age or upwards and have resided in the state 6 months, in the county 40 days, and in the precinct, township, or ward 10 days. Comp. St. c. 26, § 3. The defendant contended that the residence of an infant is that of his parents or guardian, and that, as Estler was an infant when he went to Nebraska, he was incapable of changing his domicile until he reached his majority, which was less than 6 months prior to his being called as a juror. It was held that, having been emancipated by his parent, he was capable of acquiring a legal domicile in Nebraska,

and that, having reached the age of 21 years and having resided there more than 6 months prior to being called as a juryman, he was a duly qualified voter. The court said:

"The general rule as to the power of an infant to change his own residence is doubtless in harmony with the contention of defendant. But that rule, like many others, has its exceptions. A minor who has been emancipated by his parents is capable of acquiring a legal domicile or residence of his own. 10 Am. & Eng. Enc. Law (2d Ed.) 31, note."

See, also, Woolridge v. McKenna (C. C.) 8 Fed. 650, 681–685; Lubec v. Eastport, 3 Greenl. (Me.) 220, 222; Monroe v. Jackson, 55 Me. 55, 58; Thomaston v. Greenbush, 106 Me. 242, 76 Atl. 690; Lowell v. Newport, 66 Me. 78.

In 29 Cyc. at page 1675, emancipation is defined as:

"The entire surrender of all the parent's right to the care, custody, and earnings of the child, as well as a renunciation of parental duties, and leaves the child, so far as the parent is concerned, free to act on its own responsibility and in accordance with its own will and pleasure, with the same independence as though he had attained majority."

If a minor, having reached years of discretion, on being emancipated, may acquire a domicile apart from that of his parents, it must be upon the theory that, having been released from the power and authority of the one entitled to his custody and control, he has the right to choose a domicile; and we are of the opinion that, inasmuch as the plaintiff, when he went to reside with his aunt, had reached years of discretion, and there was no one at that time entitled to his custody and control, as a natural guardian or otherwise, he had a right to choose a domicile for himself.

It would seem that we are further supported in this conclusion by the fact that it has been held that a married woman, who has left her husband for cause, may establish a domicile apart from that of her husband and acquire citizenship in another state for the purpose of federal jurisdiction, such as will entitle her to maintain an action for damages. Town of Watertown v. Greaves, 112 Fed. 183, 50 C. C. A. 172, 56 L. R. A. 865; Williamson v. Osenton, 232 U. S. 619, 34 Sup. Ct. 442, 58 L. Ed. 758.

[4] As domicile is the test of citizenship for the purpose of the jurisdiction of the courts of the United States (Poppenhauser v. India Rubber Comb Co. [C. C.] 14 Fed. 707; Dresser v. Edison Illuminating Co. [C. C.] 49 Fed. 257; Woolridge v. McKenna, supra), and as we are of the opinion that the plaintiff acquired a domicile in Maine, the requisite citizenship for federal jurisdiction appears.

[5] The accident occurred in Massachusetts. The plaintiff was a trespasser upon one of the defendant's cars, and, according to the law of that state, the only duty the defendant owed him was "to refrain from willfully, recklessly, or wantonly exposing him to injury." Albert v. Boston Elevated Ry. Co., 185 Mass. 210, 211, 70 N. E. 52, Being a trespasser, it owed him no duty of protection. "Its servants had the right to remove him from the car, but in doing so were required to subject him to no unnecessary hazard. They had no right to seize him and throw him from the car whilst it was in motion, or

to so violently assault or frighten him as to cause him to fall from the car. In order to justify a recovery, the acts of the defendant's servant must have been improper, unnecessarily dangerous, the proximate cause of the injury, and done for the purpose of removing the plaintiff from the car." Ansteth v. Buffalo Ry. Co., 145 N. Y. 211, 39 N. E. 708, 45 Am. St. Rep. 607.

[6, 7] The defendant contends that there was no evidence from which it could have been found that the plaintiff's injury was due to the willful conduct of the defendant for the reasons (1) that it could not be found that the trainman who, in a threatening manner, ordered the plaintiff off the car was acting within the scope of his authority, or (2) that the injury was the direct result of such conduct. If on the evidence fair-minded men might differ as to these questions, the case should have been submitted to the jury.

The plaintiff at the time of the accident was a little over 8 years of age. He was living at his uncle's home on Sixth street, in Cambridge, distant some 200 feet or more from where defendant's railroad crossed the street. There was a platform beside the street near the crossing. On that side of the street, and between it and the railroad, were located the factories of the Speare Oil Works, and beyond the railroad was a field where boys were accustomed to play. The day of the accident the plaintiff left home to go fishing with two other boys, one of whom was about his age and the other some 3 or 4 years older. On their way home they stopped at the platform above referred to and played tag. On the side of the street opposite the platform stood a train, consisting of an engine, two flat cars, and a tank car. The plaintiff and one of his companions, understanding that the cars were to be backed across the street and down the siding to the Speare Oil Works, crossed the street and climbed upon the tank car, which was the rear car in the train. In the center of this car and extending lengthwise of it was a large oil tank, about the height of a man. The platform of the car extended out a sufficient distance from the tank to afford a passageway. Along the side of the car was a rail, and at the end of the car, or near there, on the right side, facing the engine, was a step extending towards the ground. Whether the step was at the end, or at the side of the car near the end, the evidence fails clearly to disclose. It was by means of this step that the plaintiff climbed upon the car. After reaching the platform, he lay there on his stomach, with his feet hanging over the end of the car. While in this position he saw a trainman between the first and second cars pull the pin and give a signal to kick the detached cars across the street, and down into the yard of the Speare Oil Works, and board the same. When the cars had gone about halfway down the yard, the trainman, who was then about the center of the tank car, was seen coming toward the plaintiff, shouting at him to get off, or he would break his neck. The trainman was a large, rough-looking man, and his conduct so frightened the plaintiff that he jumped, and in doing so fell under the cars. He testified:

"I jumped right off, just as soon as he hollered. I didn't think for a minute, or do anything; I just jumped."

The result was the cars ran over him and cut off both his legs. The evidence further showed that the plaintiff had no intention of getting off the car until it stopped, which it was soon to do, and that it was going at a pretty good speed at the time. No one but the trainman was in charge of the cars after they were kicked across the street.

[**8, 9**] We think that, in view of the immature age of the plaintiff and the conduct of the trainman in going towards him and threatening to break his neck if he did not get off, it was for the jury to say whether the plaintiff's action, under the circumstances, was not due to restraint induced by fear rather than his own volition, and that, as no one but the trainman was in charge of the cars after they were kicked across the street, it could also be found that he was acting within the scope of his authority.

It is not the province of the court to determine questions of fact that properly should be submitted to a jury, and, being of the opinion that the evidence presented such questions, the court erred in directing a verdict for the defendant.

The judgment of the District Court is vacated, the verdict set aside, and the case is remanded to that court for further proceedings not inconsistent with this opinion, with costs to the plaintiff in error.