THE STATE ex rel. CHARLES VULGAMOTT v. FRANCIS H. TRIMBLE et al., Judges of Kansas City Court of Appeals.

In Banc, July 28, 1923.

1. **CERTIORARI: To Court of Appeals: Conflicts Considered.** Upon *certiorari* to a court of appeals based on conflict of its decision with previous decisions of this court, not only will conflicts suggested by relator be considered, but the decision will be quashed if it conflicts with any ruling of this court, whether such ruling be found in the cases cited by relator or respondent or in cases discovered by the court itself.

2. ———: ———: **Record Facts Incorporated by Inference: Second Appeal.** Upon *certiorari* to a court of appeals, this court will go to the record for the details of such matters as are incorporated in its opinion by reference. Where the opinion of the court of appeals states the petition contained certain allegations this court can go to the record for the entire petition. And the answer and instructions, if incorporated in the opinion by reference, will be considered. Likewise, the opinion of the court of appeals on a former appeal in the same case, if incorporated by reference in the opinion, will be considered.

3. **NEGLIGENCE: Humanitarian Doctrine: Implies Imminent Peril.** The humanitarian or last-clear-chance or discovered-peril doctrine contemplates that the party injured was in imminent peril, and could have been saved from the impending peril by the exercise of ordinary care by the one inflicting the injury.

4. ———: ———: **Neither Pleaded Nor Proven: Contributory Negligence.** The Court of Appeals in its opinion ruled that the petition stated a case under the humanitarian or last-chance doctrine, to which the defendant's answer pleaded contributory negligence. *Held*, that neither the petition nor the facts made a case under that doctrine, and plaintiff's contributory negligence, pleaded and

proven, precludes him from a recovery, and the Court of Appeals in ruling otherwise contravened Scrivner v. Mo. Pac. Ry. Co., 260 Mo. 421, and Degonia v. Railroad, 224 Mo. l. c. 586, where it is held that plaintiff's contributory negligence bars recovery in a case in which the facts make the humanitarian rule wholly inapplicable.

5. ——: ——: **Shipping Stock: Riding in Car.** Plaintiff was riding in a freight car in which four of his horses, separated from his household furniture by a strong partition, were being shipped, and in switching, the car was suddenly stopped by the engineer and one of the horses thrown against the partition, which gave way, and the horse fell upon him, as he sat upon a bale of hay. His written contract contemplated that he would ride in the caboose, and he was therefore guilty of contributory negligence in riding in the car. *Held*, that riding in the car was not safe, nor was the throwing of the horse against the partition an apparent peril, but neither was imminent peril or such impending known peril as makes applicable the humanitarian doctrine, and his contributory negligence bars recovery, and the Court of Appeals contravened numerous decisions of this court in holding otherwise.

## Certiorari.

RECORD QUASHED.

*Wright & Ford* for relator.

(1) Instruction "C" submits an issue not raised by the pleadings, which is contrary to the rule laid down by this court. State ex rel. v. Ellison, 270 Mo. 645. (2) Instruction "C" practically tells the jury that, if the plaintiff knew he was in a place of danger in remaining in the car while the same was being switched, even though he could not extricate himself therefrom, yet, he could not recover, even though the agents, servants and employees of defendant knew he was in a place of peril and knew that he could not extricate himself, and knew this in time to avoid injuring him by the exercise of ordinary care. This amounts to a nullification of the very principle on which the humanitarian or last chance doctrine is founded, and is contrary to controlling decisions of this

court. Dalton v. Ry. Co., 276 Mo. 663; Owens v. Ry. Co., 201 S. W. 548; Bennett v. Railroad, 242 Mo. 125; Pope v. Railroad, 242 Mo. 232; Klockenbrinck v. Railroad, 172 Mo. 678.

*N. S. Brown, L. H. Strasser* and *Shinabarger, Blagg & Ellison* for respondents.

(1) On *certiorari* the inquiry of this court will be limited to determining whether the Court of Appeals announced some conclusion of law upon the facts in its opinion contrary to the last previous ruling of this court on the same or a similar set of facts. State ex rel. Mo. St. Life Ins. Co. v. Allen, 243 S. W. 841; State ex rel. Raleigh Inv. Co. v. Allen, 242 S. W. 77; State ex rel. Continental Ins. Co. v. Reynolds, 290 Mo. 371. (2) If the ultimate facts in the instant case raise the same questions of law as did those in the Supreme Court ruling, the two sets of facts are "similar" within the meaning of the cases cited above. This is necessarily true because the object of the constitutional provision authorizing the intervention of this court by *certiorari* is to preserve harmony in the opinions of the several courts of last resort. State ex rel. Arel v. Farrington, 272 Mo. 162; State ex rel. Jones v. Robertson, 262 Mo. 535; State ex rel. U. Rys. Co. v. Reynolds, 257 Mo. 35. (3) The conclusion of the Court of Appeals will not be disturbed by this court if it is right and legal, even though based on premises of law which are partly incorrect. Neither will a correct ultimate conclusion be disturbed because there be, perchance, in the opinion some incorrect intermediate or minor legal conclusion inconsistent with the final conclusion. State ex rel. Box Co. v. Reynolds, 284 Mo. 386; State ex rel. Long v. Ellison, 272 Mo. 588; State ex rel. Am. Mfg. Co. v. Reynolds, 270 Mo. 602. (4) In its investigation this court will confine itself to the evidentiary facts recited in opinion of the appellate court, but may examine also the pleadings, instructions and former ap-

pellate opinion referred to therein. State ex rel. Studebaker Corp. v. Trimble, 247 S. W. 122; State ex rel. Vogt v. Reynolds, 244 S. W. 930; State ex rel. Raleigh Inv. Co. v. Allen, 242 S. W. 78. (5) This court having acquired jurisdiction of this cause, respondents may suggest and the court may consider other points than those presented by relator, with respect to which the decision of the Court of Appeals is in conflict with the last controlling decisions of this court. State ex rel. Shawhan v. Ellison, 273 Mo. 218; State ex rel. Ry. Co. v. Reynolds, 286 Mo. 223. (6) Questions as to the correctness of the ruling that Instruction C should have been given are not properly in the case, because there was no case for the jury, and the decision of the Court of Appeals to the contrary is in conflict with the last rulings of this court on the point. Boesel v. Wells Fargo & Co., 260 Mo. 478; Waldmann v. Skrainka Const. Co., 289 Mo. 633; Strother v. Mill. Co., 261 Mo. 15; Gate City Bank v. Miners & Farmers Bank, 259 Mo. 576; Trainer v. Mining Co., 243 Mo. 359; Fritz v. Ry. Co., 243 Mo. 81. (7) Instruction C was within the issues. (a) The facts hypothesized in the instruction were conclusively developed on the plaintiff's own showing. Williams v. Ice Co., 214 S. W. 386; Tannehill v. Ry. Co., 279 Mo. 165; Sessel v. Rd. Co., 214 Mo. 527. (b) The defendant's answer tendered the issue covered by the instruction. Stark v. Cooper, 203 Mo. App. 242; Auchinclose v. Frank, 17 Mo. App. 43; Secs. 1232, 1233, R. S. 1919; Laws 1907, pp. 122-3; Hynds v. Hynds, 253 Mo. 32; Dalton v. Ry. Co., 276 Mo. 671; Scrivener v. Mo. Pac., 260 Mo. 426; Nivert v. Wabash Rd. Co., 232 Mo. 646; Carter v. Met. Ins. Co., 275 Mo. 93. (c) The incorrect ruling of the Appellate Court on the meaning and effect of the answer will not vitiate the ultimate correct ruling that Instruction C should have been given. Authorities under Point 3. (8) The plaintiff was not in imminent peril until the engineer set the engine brakes, and as the accident followed immediately there was no opportunity to save the plaintiff from

injury. (a) The engineer's act was negligent, which means it was unintentional, unanticipated. Evans v. Ill. Cent. Ry. Co., 233 S. W. 398; Raming v. Met. St. Ry. Co., 157 Mo. 506. (b) Since the plaintiff was put in imminent peril suddenly and unexpectedly and there was no chance of averting his injuries thereafter, the humanitarian doctrine does not apply to the case and the opinion of the Court of Appeals to the contrary is in conflict with: Lackey v. United Rys. Co., 288 Mo. 143; Wynne v. Wagoner Undertaking Co., 274 Mo. 599; Keele v. Ry. Co., 258 Mo. 77; Bennett v. Term. Railroad Assn., 242 Mo. 125; Pope v. Wabash Rd. Co., 242 Mo. 232; Ellis v. Met. St. Ry. Co., 234 Mo. 678; Graefe v. Transit Co., 224 Mo. 260; Mirrielees v. Wabash Railroad Co., 163 Mo. 470. (9) On the plaintiff's false theory that he was in imminent peril throughout the switching operations, the humanitarian doctrine will not avail him, because he deliberately entered into the perilous position, when he could have escaped, and the judgment of the Kansas City Court of Appeals is in conflict with: Kinlen v. Met. St. Ry. Co., 216 Mo. 163; Laun v. Railroad Co., 216 Mo. 563; Reeves v. Railroad Co., 251 Mo. 169; Keele v. Ry. Co., 258 Mo. 80; Alexander v. Frisco Ry. Co., 289 Mo. 620; State ex rel. v. Reynolds, 233 S. W. 220; Butler v. United Rys., 238 S. W. 1080; Hammond v. Emery-Bird-Thayer D. G. Co., 240 S. W. 174; Karte v. Brockman Mfg. Co., 247 S. W. 423.

GRAVES, J.—*Certiorari* to the Kansas City Court of Appeals. The case out of which this action grows is an action for personal injuries by Charles Vulgamott v. John Barton Payne, Director General of Railroads.

The case has been in the Court of Appeals twice. [Vulgamott v. Davis, 229 S. W. 394; Vulgamott v. Payne, 245 S. W. 592.] It is from the latter opinion and judgment that the relator, Vulgamott, seeks relief through the present action. The case is singular in one respect, in that both sides of the present controversy contend that

the opinion and judgment is wrong. They assign quite different reasons, for their respective suggestions. The facts as stated in the Court of Appeals opinion are as follows:

"This is a suit in damages on account of personal injuries sustained by plaintiff while riding in a freight car operated by defendant. The facts are substantially as follows:

"In the Spring of 1919, the plaintiff, a farmer then about forty-six years old, lived in Stoddard County, Missouri. He desired to move back to Nodaway County, where he had formerly lived, and chartered a car from the Iron Mountain Railway Company, in which he stored his household goods, farming implements, and four head of horses. The household goods and implements were placed in one end of the car, and the four horses in the other end. The space between the two side doors of the freight car was reserved by the plaintiff as 'living quarters' for himself, his son, Jake Vulgamott, and a young man named Floyd Grace. The end of the car in which the four horses were quartered was fenced off from the center space of the car, between the two side doors, by a partition made of a strong white-oak pole extending across the car and nailed at each end to the upright pieces on the two sides of the car with twenty-penny spikes. This pole was about four and one half feet above the floor, and below it were cypress boards one and one-fourth inches thick and about twelve or fourteen inches wide, extending across the car. The four horses weighed about 1600 pounds each, and were permitted to run loose in that end of the car. In the space between the two side doors, plaintiff placed one or more loose bales of hay and a barrel of water, none of these being fastened down in any way.

"The car moved from Dudley, Stoddard County, to St. Louis, or to Luther, a suburb of St. Louis, and was there delivered to the Wabash Railway Company, then in charge of the Director General of Railroads. At this

point a new contract of shipment was entered into for the transportation of the car and contents to Burlington Junction, Missouri. At Burlington Junction, the Wabash Railroad crosses the Chicago, Burlington & Quincy Railroad practically at right angles, the Chicago, Burlington & Quincy tracks running approximately north and south and the Wabash tracks approximately east and west. A curved switch connects the two roads, and a joint stockyards is maintained at a point on the Burlington tracks about two blocks north of the Wabash crossing.

"The car was transported to Burlington Junction in a freight train which arrived at that station about 1:35 a. m. on the night of February 19, 1919. When the train reached Burlington Junction it stopped at the railroad station, which was near the Wabash tracks in the northeast angle between the intersecting tracks of the Chicago, Burlington & Quincy and Wabash. Plaintiff was awake at the time and knew the train had reached Burlington Junction. There was a suitable place for him to alight from the car at the place where it came to a stop. He knew that it would be necessary to switch the car over the curved track connecting with the Chicago, Burlington & Quincy road and thence two blocks or so northward in order to 'spot' the car at the stockyards chute. Plaintiff remained in the car.

"After the train had come to a stop, the engine and plaintiff's car were disconnected from the rest of the train, and, by means of a flying switch, the emigrant car was run on to the curved track connecting the two railroads, the engine came in behind it, was coupled to it and pushed it up to the stockyards chute. During this operation, the car was being pushed north and the horses were in the south end of the car next to the engine. When the car reached the stockyards, in an effort to bring it to a stop so the side doors of the car would be opposite the stockyards chute, the engineer applied the brakes so tightly that the car came to a stop too suddenly, in consequence of which one of the horses in the south part of

State ex rel. Vulgamott v. Trimble.

the car was thrown against the partition, which fell down and against plaintiff while he was sitting on a bale of hay and leaning against a barrel of water. He received certain injuries in the nature of scalp wounds and a slight fracture of one of the bones of his shoulder.

"The cause was before us on a former appeal prosecuted by plaintiff from an order granting defendant a new trial. Said order was sustained and the cause remanded (229 S. W. 394) 'in order that a new trial may be had, if plaintiff so desires, under a petition presenting the case upon a theory which may entitle plaintiff to recover.' A second amended petition was accordingly filed, the cause went to trial and a verdict was returned for plaintiff in the sum of $4,000, from which defendant appeals.

"The second amended petition alleges that while the car in which plaintiff was riding was being switched from the Wabash tracks to the stockyards, the plaintiff remained in the car, in the space between the two side doors, with the knowledge and consent of the trainmen; that, while thus riding, plaintiff was exposed to danger and liable to be injured by rough and reckless switching; that the trainmen knew, or in the exercise of ordinary care should have known and anticipated, that plaintiff was in the car and thereby in a position of peril and danger, in time to have avoided injuring him by the exercise of 'ordinary care; and that notwithstanding these facts the car was negligently handled and the live stock therein was thrown violently against the partition and upon the plaintiff, causing injuries as alleged.

"Our former opinion holds plaintiff was guilty of contributory negligence in riding and remaining in said car while it was being switched, and therefore that he could not recover on a general charge of negligence, and it clearly was the intention of plaintiff in the second amended petition to plead a case under the humanitarian or last-chance rule. Defendant takes the position that this has not been accomplished, and it is chiefly upon this question that defendant relies for reversal.

"Briefly stated, the answer admits that the Director General was operating said railroad at the time of the accident; admits 'the transportation contract and that the property covered by said contract was transported; that injuries were received by plaintiff while riding in the freight car during the switching 'thereof, and that plaintiff was exposed to danger and liability of being injured by rough handling of the car during switching. Then follows a general denial, a denial of certain particular facts, an allegation that plaintiff violated his contract and was a trespasser while riding in said car, and a plea of contributory negligence."

The case was reversed and cause remanded because the trial court refused to give the following instruction:

"The court instructs the jury that plaintiff, as a matter of law was guilty of negligence in riding in the emigrant car; and if you find from the evidence that he knew he could not ride in said car in safety while the same was being switched, then your verdict should be for the defendant."

The court modified the refused instruction and gave it in this form:

"The court instructs the jury that the plaintiff, as a matter of law, was guilty of negligence in riding in the emigrant car; and if you find from the evidence that he could not ride in said car in safety while the same was being switched *in an ordinarily careful and prudent manner* then your verdict should be for the defendant."

The italicized words were the words added by the court. The opinion says the following, as to this matter:

"We think the instruction as given by the court was improper because the question of whether plaintiff knew he could not ride in said car in safety while it was being switched, in any manner, was a question for 'the jury, and defendant was entitled to have said question submitted. We hold, therefore, that the giving of the instruction as modified by the court was prejudicial error. The judgment is reversed and the cause remanded."

This sufficiently outlines the case.

I. As indicated by the statement, supra, both sides of the case below suggest and urge that the opinion of the Court of Appeals conflicts with divers rulings of this court. Our jurisdiction in this class of *certiorari* cases is dependent upon conflict or alleged conflict in opinions.

Conflicts Considered. However, we have ruled that when our writ has been issued, and the case is before us for determining the question of alleged conflict between the opinion under review, and the rulings of this court, we are not confined to the suggestions of conflict made by the relator, but on the contrary the court can and will quash the record of the Court of Appeals, if it conflicts with any ruling of this court of which the court has knowledge, although such case or ruling has not been suggested by relator, but has been suggested by counsel for respondents, or discovered by the court itself. [State ex rel. v. Ellison, 273 Mo. 1. c. 228; State ex rel. v. Reynolds, 286 Mo. 1. c. 223.]

When we once acquire jurisdiction by reason of alleged conflicts, we will consider all suggested conflicts, or conflicts not suggested, but within the personal knowledge of the court. The purpose of this peculiar form of *certiorari* is to secure uniformity in opinions, and harmony in the law. So that, our review of this case may be more extended than is usual in most cases.

II. The opinion before us in the instant case, by reference, incorporates much of the record. Our rule is well settled that we can go to such incorporated matter for the details of the case in the Court of Appeals, so far as the instruments referred to by the opinion shed light upon the details. The amended petition, upon which the case was tried for the second time, after averring that defendant contracted to transport an emigrant car (chartered by plaintiff) from St. Louis to Burlington Junction, Missouri, which car was to be accompanied

by plaintiff as caretaker of the live stock therein, avers the alleged negligence in the following language:

"That while said car was being switched to the usual place of unloading at Burlington Junction, as above set forth, the plaintiff, with the *knowledge* and *consent* of the Director General of Railroads, his agents, servants and employees, occupied a position on said car and in the space between the horses in one end and the implements and goods in the other end, and was being taken down to said stock pens and chute, the usual place of unloading, with said stock and goods, and while thus riding in said car was exposed to danger and liable to be injured and *known* by the agents, servants and employees of the Director General of Railroads to be exposed to danger and liable to be injured by rough and reckless handling of said car while being switched to the usual place of unloading: that in switching said car to the chute and stock pens, the usual place of unloading, and while 'spotting' the car at the chute, the agents, servants and employees of the Director General of Railroads, who were in charge of said car and the locomotive that was moving the same, though knowing, or, by the exercise of ordinary care, and having good reason to know, could and should have known, anticipated and expected plaintiff's presence in said car and that he was exposed to danger by being in said car, in time to have avoided injuring plaintiff by the exercise of ordinary care, were so careless, negligent, violent and reckless in the management of said car and the locomotive attached thereto, and that was being used in moving said car, that the live stock, then in said car, was hurled and thrown with such force and violence against and into the partition, theretofore installed and constructed in said car to separate the live stock from the implements, household goods and other property in said car, that said partition, though being strong, heavy and substantially built, was broken, the boards and timbers used in the construction thereof, split and broken and forced loose from the car and the

parts to which it was attached, and a portion of said live stock and especially one of the horses, hurled upon and through said partition and against and upon this plaintiff then in said car, knocking plaintiff to the floor, of said car, some of the parts of the partition striking plaintiff and one of the horses falling upon him, all with such force and violence that the shock severely and permanently injured plaintiff.''

The answer, referred to in the opinion, after making certain admissions (not material here), says:

''That on or about February 18, 1919, the plaintiff entered into a contract with the then Director General of Railroads whereby the latter undertook to transport on said railroad from St. Louis, Missouri, to the usual place of unloading at Burlington Junction, Missouri, certain live stock which it was agreed the plaintiff should accompany as caretaker while in transit.

''That pursuant to said contract said Director General of Railroads transported said live stock from St. Louis to Burlington Junction, and delivered the same at the stockyards chute in Burlington Junction, on or about February 20, 1919.

''That in the switching of the car containing said live stock at said stockyards at Burlington Junction, the plaintiff received certain injuries while riding in said car, which were occasioned by the falling of a horse or horses against the plaintiff and certain of the contents of said car.

''And that while riding in said car the plaintiff was exposed to danger and the liability of being injured by rough or reckless handling of said car during switching operations.

''Further answering the defendant denies each and every other allegation in said petition contained: and particularly denies that by said contract said Director General of Railroads agreed to transport the car containing said live stock between said stations; denies that said Director General of Railroads, his agents, servants or

employees knew or had any cause to believe the plaintiff was in said car; denies that said injuries received by the plaintiff were caused by any negligence or carelessness on the part of said Director General, his agents, servants or employees; and denies that the plaintiff's injuries were of the character or extent in said petition alleged.

"II. Further answering this defendant states that said contract under which said live stock were transported, as aforesaid, was a written contract made and entered into between the plaintiff and said Director General of Railroads on or about February 18, 1919, and signed by both parties; that in said contract the plaintiff agreed not to ride in the car containing said live stock while accompanying the same as caretaker; but, the defendant states, the plaintiff, in violation of said agreement, undertook to ride and did trespass and ride in the freight car containing said live stock while said car was being switched at the stockyards in said town of Burlington Junction, and sustained the injuries received by him as the direct and proximate result of being in said car, at said time in violation of said contract—all without the knowledge of said Director General, his agents, servants or employees, and without any reason or ground for their thinking or anticipating that he was in said car.

"III. Further answering, this defendant says that any injuries received by the plaintiff on the occasion mentioned in his said petition were due to his own negligence directly contributing thereto, in this: that at said time, the plaintiff rode in said freight car containing said live stock, household goods, implements and other personal property while the same was being switched and set out on the side track at Burlington Junction, and was seated on a bale of hay and leaning against a barrel of water, all being close to and against

the partition separating the horses in said car from the other contents; that said horses were untethered and likely to be thrown down by the motion of said car during switching operations; that said barrel of water and said bale of hay were not fastened down and were likely to be upset or thrown about by the motion of said car during switching operations; that said car, during said switching operations, in the dark, was likely to be jarred, jolted and suddenly started or stopped in the course of being switched; that the trainmen in charge of said switching operations did not know the plaintiff was in said car or in said dangerous position close to said horses, and did not have any ground for anticipating his presence there; that all of the above facts were then and there known to the plaintiff, or in the exercise of reasonable care on his part should and would have been known to him.

"IV. Wherefore, having fully answered, the defendant prays to be discharged with his costs in this behalf expended."

By reference the opinion of the first hearing in the Court of Appeals is incorporated in the opinion here. The answer is likewise incorporated as are also certain instructions. The opinion treats the case as one falling under the humanitarian rule. It says that after the ruling in the first appeal the petition was amended, in an attempt to state a cause of action under the humanitarian rule. The opinion on the first appeal ruled that plaintiff was guilty of contributory negligence. In that trial the plaintiff had a verdict, but the trial court set it aside, among other things, upon the ground that a demurrer to the evidence should have been given. The Court of Appeals affirmed the order granting the new trial and remanded the cause to the circuit court by the following language:

"We think the court ruled correctly in granting a new trial. Hence the judgment thereon is affirmed, and the cause is remanded (if such an order is necessary), in

order that a new trial may be had, if the plaintiff so desires, under a petition presenting the case upon a theory which may entitle the plaintiff to recover.''

Following the suggestion in this short excerpt contained, the plaintiff filed the amended petition, from which are quoted the grounds of negligence, supra. The foregoing outlines, although rather long, is necessary to a complete understanding and determination of the questions raised in the instant case. Such questions we take next.

III.   Neither the petition nor the facts in this case make a case under the ''humanitarian,'' ''last-clear chance'' or ''discovered-peril'' doctrine. This doctrine of the law, by whatever name it may be known, contemplates that the party was in imminent peril, and could have been saved from such impending peril by the exercise of ordinary care by the one inflicting the injury. In Degonia v. Railroad, 224 Mo. l. c. 586-7, we undertook to give an outline of the humanitarian rule. The basic principle is that there must be an imminent or impending peril which can be averted by the exercise of ordinary care. The petition in this case does not state this kind of a situation, nor do the facts show it. The most that is either pleaded or proven is that plaintiff was in a place where he might possibly be injured, if the agents of defendant were careless and reckless in the handling of the car in which he was riding. He says that he was riding in the car with their knowledge and consent in one portion of the petition. Whether he meant by this, that his shipping contract entitled him to be there, and he was there by virtue of the contract, and therefore constructively, if not actually, there with the knowledge and consent of defendant, or the agents of defendant later consented to him being in the car, without reference to the transportation contract, is a question of fact not found by the Court of Appeals. The opinion does, however, mention the contract, and referring to it, under our rule as to

*Humanitarian Rule: Wrong Theory.*

written documents, we find this provision in the contract between defendant and Vulgamott:

"In consideration of the carriage of the undersigned on a freight train in charge of the live stock mentioned in the within contract, whether with or without charge for such carriage, each one of the undersigned severally hereby voluntarily assumes all risks of accident or damage to his person or property, and hereby releases and discharges each and every carrier from every claim, liability or negligence of such carrier or any of its employees or otherwise; and agrees that whenever he shall approach or leave the caboose or pass over or along the cars or track, he will do so at his own risk of personal injury, from whatever cause, and that no carrier shall be required to stop or start its train or caboose cars at or from the depots or platforms, or to furnish light for his accommodation or safety."

This was entered into at St. Louis, where the car was transferred from the Missouri Pacific Railway Company to defendant company. A similar provision was in the main contract thus:

"Sec. 7. Any person accompanying said live stock, in charge of the same, leaving or approaching the caboose, or passing over or along the cars or tracks, shall do so at his own risk of personal injury from any cause whatever, and no carrier shall be required to stop or start its trains or caboose cars at or from depots or platforms, or to furnish lights or other conveniences for the accommodation or safety of any person accompanying said live stock."

It was upon these provisions that the Court of Appeals affirmed the order of new trial upon the first appeal, at that time saying:

"Unquestionably in the car was a much more dangerous place to ride than in the caboose, since, if one is in the former, he is likely to be hurt by the jerking, jolting, or sudden stopping of the train; and it is also certain that if plaintiff had not been in the car he would

not have been injured by the sudden stop. Hence, it is held that if one voluntarily rides in the car, instead of in the caboose, he is guilty of contributory negligence which precludes his right to recover. [Scrivner v. Missouri Pacific Ry. Co., 260 Mo. 421, 434, 435, 169 S. W. 83; Fussellman v. Wabash Ry. Co., 139 Mo. App. 198, 203, 122 S. W. 1137; Rawlings v. Ry. Co., 175 S. W. 935; Bruce v. Ry. Co., 136 Mo. App. 204, 116 S. W. 447.] It is true, in the Scrivner and Rawlings cases, supra, the contract of carriage expressly forbade the shipper riding in the car while the train was in motion. But while there is no clause in 'the present contract expressly forbidding it, yet inferentially it requires him to ride in the caboose, and assumes that he will ride there, for it says: 'Any person accompanying said live stock, in charge of the same, leaving or approaching the caboose . . . shall do so at his own risk of personal injury from any cause whatever,' etc.''

The facts of this case bring it within the rule of Scrivner v. Mo. Pac. Ry. Co., 260 Mo. 421, and other cases mentioned by the Court of Appeals in the quotation, supra.

The contributory negligence of the plaintiff precluded him 'from recovery, and in not so holding the Court of Appeals conflicts with the Scrivener Case, and other cases supra. This upon the theory that the facts of the case do not bring it within the humanitarian rule, as suggested above. Of course if it were a humanitarian case, contributory negligence might be wholly unavailing. We do not think it a humanitarian case, and in so holding the Court of Appeals conflicts with Degonia's Case, supra.

IV. We said in the preceding paragraph that neither the petition nor the evidence made a case under the humanitarian rule, and that the Court of Appeals conflicts with our cases in so ruling. This point we wish to elaborate. Plaintiff was riding in the car, when his contract contemplates that he ride in the caboose. He

was not only there himself, but had two other parties with him, as appears from the evidence. His horses were separated from the remainder of the car by a strong partition. It was not a safe place to ride, but his position was not so perilous as to bring it within the humanitarian rule. As said, supra, we must have imminent danger or peril to invoke such rule. The "peril" of the injured party is the real foundation upon which the structure of this doctrine rests. The word "peril" as used in the rule "discovered peril," "humanitarian rule" or "last chance doctrine" means something more than a bare possibility of an injury occurring. The position of plaintiff in this car was not such as to indicate a perilous situation, within the rule. The place was more or less dangerous as the riding upon freight cars is more or less dangerous. It was no doubt more dangerous than riding in the caboose of a freight train. It was more dangerous in a switching movement, than in ordinary train movement. Again that a horse would be thrown against the partition and forced through it and upon plaintiff was not an apparent peril, before the actual occurrence. Through all the cases and the texts runs the idea of "peril," and in a broader sense than the mere possibility of injury. Thus in 20 R. C. L. p. 140, the rule of "discovered peril," "humanitarian rule" or "last chance doctrine" is thus stated:

"The doctrine really means, however, that even though a person's own acts may have placed him in a position of peril, yet if another acts or omits to act with knowledge of the peril, and an injury results, the injured person is entitled to recover."

For a review of the cases and texts, see note of the learned annotator in Ann. Cases, 1912 B.

If the facts of the case do not bring it within the humanitarian rule, then the negligence of plaintiff would preclude his recovery. This was ruled by the Court of Appeals on the first appeal. [Vulgamott v. Hines, 229 S. W. l. c. 395.] That ruling should have been ad--

hered to upon the second appeal, because of the absence of pleaded or proven facts to bring the case within the humanitarian rule—the only thing which would obviate the contributory negligence of plaintiff.

With the foregoing views it is not necessary to discuss the ruling of the Court of Appeals as to Instruction C. Reasons assigned above suffice to quash the record and opinion of the Court of Appeals, and it is so ordered. *Woodson, C. J., David E. Blair*, and *Walker, JJ.*, concur; *James T. Blair* and *Ragland, JJ.*, dissent.