LESTER E. FRAILEY, JR., Appellant, v. J. M. KURN and JOHN G. LONSDALE, Trustees of ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY.—161 S. W. (2d) 424.

Division Two, May 5, 1942.

*Wayne Ely, T. C. Derrick* and *Lloyd E. Boas* for plaintiff.

*E. H. Nahler, A. P. Stewart* and *A. E. L. Gardner* for respondents.

BOHLING, C.—Lester E. Frailey, Jr., instituted this action against J. M. Kurn and John G. Lonsdale as trustees of St. Louis-San Francisco Railway Company to recover $75,000 damages for personal injuries sustained while stealing a ride on one of defendants' trains. Cast at the close of the evidence, plaintiff appealed.

Plaintiff and several companions in plaintiff's automobile were at Pevely's Dairy, Gore avenue and Big Bend road, Webster Groves, Missouri, about three o'clock on the afternoon of September 4, 1936, when a westbound Frisco train came by. Plaintiff was eighteen years of age, had good vision, was a high school graduate and had been active in athletics, having played football, basketball, and baseball at the Webster Groves high school. The first scheduled stop of the train was Pacific, Missouri, twenty-two miles distant. It had seventy-five cars. It was about three-fourths of a mile long, the cars being about sixty feet in length. Immediately back of the tender were sixteen coal cars, with boxcars, coal cars, and tank cars to the rear of the train. A brakeman, Leroy Umlauf, was riding the top of the first boxcar, the seventeenth car of the train. On the sides of the boxcars, near the end, were handholds, iron rungs, forming a ladder

extending from the bottom to the top of the car, and underneath the frame of the car on the side was a stirrup. The boxcars had nine such rungs while the coal cars had six. The ends of the cars have a short ladder of three or four rungs, but no stirrup. These handholds are about twenty-four inches wide, and those on the end come within about two inches of the side of the car and are about two and a half feet from the coupling. The train was moving slowly and some of the young men decided to ride the train to Kirkwood, three miles distant, plaintiff telling Robert Mier to drive plaintiff's car to Kirkwood and meet them. Plaintiff, Jimmy Martin, and Harry Nabors "hopped" the train. Nabors rode a short distance and got off but plaintiff and Martin remained on the train. They got on to the rear of the brakeman. Plaintiff testified he got on first, hopping the rear north ladder of a boxcar; and that there was one boxcar between him and Martin, who caught the north front ladder of a boxcar. When the train reached Kirkwood it was traveling too fast for them to get off, plaintiff testifying it was traveling thirty-five to forty-five miles an hour. Crescent is approximately thirteen miles west of Kirkwood on the Frisco railway. After passing Kirkwood, Martin moved from the ladder on the side of the car to the ladder on the end of the car, he testified, on account of the wind and was between the two cars. Plaintiff continued to ride the ladder on the side of the boxcar. The track had a number of curves in it; and the only evidence of record on the point is that from one and a half miles east of Crescent to approximately one thousand feet west of Crescent the train was moving up grade. Plaintiff testified: "The train kept rocking back and forth, jerking and lurching, and it was awfully hard to stay on, and my arms got tired, and I had to hold on like this, (indicating) instead ▇▇▇ of holding on with my hands. Q. You put your arm between the ladder and the car to hold on? A. Yes, Sir." About a mile, or a minute or two before the train reached Crescent, it went around a curve of which plaintiff was on the inside. He testified: "And as we went around the curve I noticed the brakeman on top of the car and he was standing at the time. He turned around and saw me, then started to come back, making gestures like this (indicating), and I became very fearful then. The Court: Describe those gestures so that we get it in the record. A. Well, his gestures were with his hand, and it looked to me as though his fist might have been clenched, and he started coming back towards me [took five or six steps], and that is what caused me to step in between the cars on the coupling. . . . As I saw the brakeman coming towards me, I stepped in between. I had to pull myself to another rung and step up in the coupling. I was very scared. I didn't know what to do because I couldn't get off at the speed the train was going. I had no intention of jumping whatsoever." He testified the brakeman was three car lengths ahead of him, he did not remember the brakeman saying anything, could not have heard if he had, and that

nothing was thrown at him. Plaintiff was then between the ends of two boxcars, standing, he thought (he didn't know) on something that was more or less an iron plate, when suddenly his right foot slipped between the coupling, slipped "into some crevice or some crack," and "the coupling came together and my foot was pinched;" he didn't have any idea how it was crushed. Plaintiff did not look down but pulled his foot away. "The Court: Let me understand that. After your foot was pinched, what did you do? A. I freed it after a while, and I saw it was bleeding and saw the bones were sticking out, my shoe was crushed and torn open, and I could see more or less bare flesh there, and naturally anyone seeing that would become faint, and I tried to throw myself out so I wouldn't fall in between the cars. The Court: Throw yourself out what way? A. To the north. Outside. To clear myself, in other words, to get off the train. The Court: You wanted to jump off? . . . A. I tried to jump off after my foot had been pinched." Plaintiff placed the speed of the train at forty miles an hour and the place where he jumped at forty feet west of the station at Crescent. The train ran over his left leg, and he received other injuries.

Members of the train crew testified that they were not aware of plaintiff's presence on the boxcar; that they were not informed of the accident until the next day, and it is defendants' position, taken from a statement given by plaintiff, that he received his injuries when he attempted to alight from the train at Crescent. However, we take the facts most favorable to plaintiff.

Section 4795, R. S. 1939, provides: "if any person, minor or adult, shall climb upon, hold to or in any manner attach himself to any locomotive engine or car while the same shall be in motion, or running into or through any city or town in this state, he shall be deemed guilty of a misdemeanor. . . ." Plaintiff was a voluntary trespasser. He takes the position that "the defendants owed him no duty except to refrain from willfully or wantonly injuring him," arguing that defendants "were grossly negligent;" and that although defendants owed him no duty until he was discovered, it was "the duty of the defendants to exercise ordinary care for his safety after discovering him in a position of peril."

Trespassers accept the existing conditions as they find them. Plaintiff knew the train was moving. That its speed would be accelerated between stops and would be accompanied by correspondingly increased motion and vibration of the cars was but the natural consequence of the conduct of defendants' business and was known and obvious to one of plaintiff's age and experience. Plaintiff's mental state was one of a willingness to accept these conditions. There is no evidence that the train was negligently operated or operated other than in the usual and ordinary conduct of defendants' business. The swaying and jolting of the cars was as great on the top of the boxcar where the brakeman was sitting or standing as where plaintiff was

on the ladder. Plaintiff, in attaching himself to defendants' train and riding thereon, assumed the risks arising from the usual and ordinary operation of the train. Blavatt v. Union Elec. L. & P. Co., 335 Mo. 151, 155[1], 71 S. W. (2d) 736, 737[1-3] ; Butz v. Cavanaugh, 137 Mo. 503, 512, 38 S. W. 1104, 1106; Karr v. Chicago, R. I. & P. Ry. Co. ▮▮▮▮ 341 Mo. 536, 545[2], 108 S. W. (2d) 44, 48[3]. If defendants owed plaintiff only the negative duty of refraining from willfully or wantonly injuring him, as stated by plaintiff, did they owe plaintiff any affirmative act? Plaintiff may not base a recovery on his own deliction. [Consult Barney v. Hannibal & St. J. Rd. Co., 126 Mo. 372, 392(IV), 28 S. W. 1068, 1074(4), 26 L. R. A. 847.] Plaintiff's invasion of defendants' rights in voluntarily hopping defendants' train and continuing to ride thereon and the delict of any duty, if any delict there be, owed plaintiff by defendants arising from the operation of the train in the usual and ordinary conduct of defendants' business were, at best under this record, mutual faults, and, absent other factors depriving defendants of such defenses, the law does not cast the consequences upon defendants or authorize any apportionment thereof. [Consult Moore v. Lindell Ry. Co., 176 Mo. 528, 542-4, 75 S. W. 672, 676; Annotations, 41 A. L. R. 1379; L. R. A. 1918D, 1195.] We think the action attributed by plaintiff to the brakeman of gesticulating towards plaintiff with his fist clenched and taking several steps in his direction is not sufficient under the instant record to make a case on the issue of willful or wanton negligence when directed to one of plaintiff's age and experience. [Shelly v. Boston Elev. Ry. Co., 211 Mass. 516, 98 N. E. 575; Osalek v. Baltimore & O. Rd. Co., 295 Pa. 553, 559, 145 Atl. 582, 584; Annotation, 72 A. L. R. 551.] The brakeman was three car lengths distant, one hundred and eighty feet, from plaintiff at the time. He did not throw anything at plaintiff and plaintiff did not hear him say anything. In addition, plaintiff testified on several occasions in this record that he had no intention of jumping off on account of the brakeman's action. He finally jumped because his foot was crushed. Plaintiff did not lose his self-control. The cases relied on by plaintiff are sufficiently distinguished by evidence establishing an apparent present ability and threat on the part of the railroad's employees to forcibly eject the trespasser. Fink v. Kansas City So. Ry. Co., 161 Mo. App. 314, 143 S. W. 568 (involving a brakeman's throwing missles at a ten-year old boy, causing him to dodge and, in dodging, his foot to slip and suffer injuries) ; Farber v. Missouri Pac. Ry. Co., 139 Mo. 272, 40 S. W. 932 (involving, according to said plaintiff, the infliction of physical punishment to compel compliance. The court considered, taking defendants' evidence, "the present power to enforce his order" a sufficient force if exercised unreasonably l. c. 285(III) and 935(3) respectively). So too with respect to Kimbrow v. Fort Worth & D. C. Ry. Co. (Tex. Civ. App.), 86 S. W. (2d) 78 (where the facts are not stated), but

which is bottomed on Texas & Pac. Ry. Co. v. Mother (Tex. Civ. App.), 24 S. W. 79; Toledo, St. L. & W. R. Co. v. Gordon, 143 Fed. 95; and Bjornquist v. Boston & A. R. Co., 250 Fed. 929, 934[6, 7], involving an eight-year old boy).

Did plaintiff make a submissible case under our humanitarian doctrine? We think not. He rode the ladder on the boxcar from Kirkwood to Crescent, a distance of approximately sixteen miles without injury. He testified he had no intention of jumping from the train. He refused to obey the signal he claimed the brakeman gave him. Instead, he did the opposite, pulled himself up a rung higher on the ladder and stepped between the cars, and removed himself from the claimed vision of the brakeman. Plaintiff's companion, Martin, was riding between the cars and suffered no injury therefrom. Plaintiff seizes upon a passage in his cross-examination of the brakeman Umlauf to establish that plaintiff was in peril within our humanitarian rule. This witness had testified two boys hopped the coal cars between him and the engine and soon thereafter jumped off. When pressed for a reason why he did not start climbing towards them to put them off, he answered: "My life would have been in danger, wouldn't it?" Umlauf was speaking of boys on the coal cars and the necessity of his climbing over a number of coal cars to reach them. It is not to be twisted and tortured into a statement that one on the ladder of a moving boxcar and in a stationary position with respect to the car is in imminent peril. To sustain plaintiff would be to rule that Umlauf while sitting on top of the boxcar or while taking the five or six steps towards plaintiff, as plaintiff testified, was in imminent peril; and that it would be the duty of the operatives of trains to stop the train whenever they knew or had occasion to know that a brakeman was on or proceeding over the cars of a moving freight train in the discharge of his duties. The brakeman testified he was riding the top of the ▇▇▇ seventeenth car to save the walk back from the engine to perform switching duties upon arrival at Pacific. A greater duty is owed one rightfully on the cars of a moving train than is owed a trespasser. Plaintiff was not an infant. Umlauf did not have handholds to stabilize his position and movements as did plaintiff. Frequently quoted are WHITE, J.'s observations on the significance of "imminent peril" from Banks v. Morris & Co. (Banc), 302 Mo. 254, 273(II), 257 S. W. 482, 486(II): "That does not mean remote, uncertain, contingent, nor (for the person affected) avoidable danger. It is imminent, *immediately* impending; it admits of no time for deliberation on the part of the person in peril between its appearance and the impending calamity. . . . The peril would be imminent only when the ordinary and natural effort to be expected in such person would not put him in a place of safety." Huckleberry v. Missouri Pac. R. Co., 324 Mo. 1025, 1034, 26 S. W. (2d) 980, 983, says "imminent peril," according to the Banks case, means "certain, immediate, and impending peril." State ex rel. v.

Trimble (Banc), 300 Mo. 92, 109, 253 S. W. 1014, 1019, states it does not mean "the mere possibility of injury." Under the definitions one is not necessarily in a position of imminent or impending peril just because he is riding on the ladder of a moving boxcar; and especially so when he demonstrates his ability to pull himself higher on the ladder and step around the end of the car to a position between the moving cars. Cases supra; Baker v. Wood (Mo.), 142 S. W. (2d) 83, 84[2], citing cases. If plaintiff's position were dangerous, a point we do not rule, it was no more a position of imminent peril than the danger considered not to be imminent peril in Branson v. Abernathy Furniture Co., 344 Mo. 1171, 1182[4], 130 S. W. (2d) 562, 568[12]. He could have climbed on top of the boxcar. He did go between the cars. Plaintiff was not injured within the humanitarian rule by reason of maintaining a position on or between the cars. [Stewart v. Missouri Pac. Ry. Co. (Banc), 308 Mo. 383, 272 S. W. 694.] He testified he jumped because his foot had been crushed after he stepped between the cars. Any increased danger or peril occasioned by the crushing of his foot is not claimed to have been known to defendants and is not available to plaintiff for invoking the humanitarian doctrine. [State ex rel. v. Trimble, supra.]

While plaintiff's misfortune arouses our sympathy, his right to recover is opposed to law and justice. The judgment is affirmed. *Westhues* and *Barrett, CC.,* concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.