JOHN PERKINS V. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a
Corporation, Appellant.—102 S. W. (2d) 915.

Court en Banc, March 24, 1937.

870

*T. M. Pierce, J. L. Howell* and *Walter N. Davis* for appellant.

*Eagleton, Waechter, Yost, Elam & Clark* for respondent.

874

TIPTON, J.—We have come to the conclusion that the statement of facts and the ruling on the demurrer to the evidence of the divisional opinion by Commissioner HYDE are correct and will adopt the same without the use of quotation marks.

This is an action for personal injuries, sustained by plaintiff when a truck, driven by him, was struck by defendant's train. The case

was submitted solely upon negligence under the humanitarian doctrine in failing to sound an audible warning and to slacken speed. Plaintiff had a verdict and judgment for $20,000. Defendant has appealed from this judgment.

Defendant contends that its demurrer to the evidence at the close of the case should have been given because there was no case made under the humanitarian rule. The evidence, viewed in the light most favorable to plaintiff, tended to show the facts and circumstances hereinafter stated. On April 8, 1933, plaintiff driving his truck, loaded with ashes, east on Talcott Avenue in the city of St. Louis, approached its intersection with McKissock Avenue, which runs north and south across Talcott Avenue. Edward Wisa was riding with him, sitting on the right (south) side of the car. Defendant had its two main tracks laid along the east side of McKissock Avenue, and these tracks were straight for several blocks south. There were some store buildings along the west side of McKissock Avenue with an unpaved cinder roadway between them and these tracks. Talcott Avenue was forty feet wide from curb to curb paved with brick and ran slightly downgrade to the east. At the southwest corner of the intersection there was a barbecue stand which extended east beyond the other buildings on the west side of McKissock Avenue. It was twenty-six feet from the west building line of McKissock Avenue to the west rail of defendant's western track, which was used for the southbound trains. It was thirty-nine feet from this building line to the west rail of defendant's eastern track, used for northbound trains. The space between the northbound and southbound track was about eight feet. Plaintiff said that he drove into the intersection and stopped when he was about three feet east of the west side of the barbecue stand where he had a view both ways on McKissock Avenue and looked first north and then south. He said he neither saw nor heard a train and started up to cross the tracks.

It was a few minutes after seven P. M. Plaintiff said that it was dark and that he had the lights on his truck burning. He said a lighted object could be seen 250 to 300 feet. On that day, the sun set at six-thirty-one P. M., with the sky partly cloudy. There had been sprinkles of rain around six P. M. There was a street light at the northwest corner of the intersection and another at the southeast corner. These lights reflected light over an area with a radius of about fifty feet. There was a street light 158 feet south of the intersection on the west side of McKissock Avenue and another on the east side 283 feet south. There were also two street lights at the next street intersection, which was 448 feet south. There were crossing gates on Talcott Avenue but they were not operated after six P. M.

Plaintiff changed gears and started, driving about eight or ten feet from the south side of Talcott Avenue, first moving about two miles per hour, then increased his speed until he was going between five and

six miles per hour. He did not look south again until his front wheels were about in the middle of the space between the two tracks, when Wisa yelled that a train was coming. Then he saw "the bull of the engine" coming north on the eastern track, from sixty to seventy-five feet south of him. Wisa jumped out of the truck and escaped injury by running across the track in front of the train. Plaintiff swerved the truck to the left (north) but, while he was trying to get out of the way, the right front wheel of his truck got over the western rail of the track on which the train was approaching. The left corner of the pilot beam and cylinder of the engine struck the side or rear of his truck immediately after he started to turn and he was injured. He said: "I swerved immediately, if the engine had slowed down a bit I could have turned out of its path." Plaintiff and Wisa both said that there was no headlight on the engine and that there was no warning given by either whistle or bell. Plaintiff said that his brakes were in good shape and that he could have stopped his truck in eight or ten feet at the speed he was traveling when he "got notice that the train was coming."

Plaintiff also had three other witnesses, who were standing near a store, on the west side of McKissock Avenue, about seventy-five feet south of the intersection and about twenty-five feet from the track. They said that they first saw the train when it was about 100 feet south of the crossing; that it had no headlight burning; that it did not ring the bell; and that it did not sound the whistle. One of those men said that after the collision the light on the rear of the tender was on, but was dim; and that he saw one of the trainmen working on the engine headlight which was not lighted. Plaintiff's witnesses estimated the speed of the train at from 30 to 40 miles per hour. They said there were about twelve or fifteen cars in defendant's train (defendant showed seventeen); and that after the train struck plaintiff's truck, it was brought to a stop with the engine south of the next street intersection to the north and with some of the rear cars still south of the Talcott Avenue intersection.

Defendant's evidence was that the headlight of the engine was on; that the automatic bell ringer was ringing the bell all the time after they started about a mile south of the place of the collision; that four whistles were sounded about the middle of the block between Talcott Avenue and the street south of it; that whistles were also blown for street intersections farther south; that plaintiff's truck was going from fifteen to twenty miles per hour; and that their speed was about fifteen miles per hour. The members of the train crew said that defendant's switch foreman was riding on the front pilot beam of the engine carrying a lighted lantern; that the engineer was on the right (east) side of the cab; that the fireman was on the left side, from which plaintiff approached; and that the head brakeman was on the front car. The engineer said he stopped the train before

the engine reached the next street north. The fireman said the train ran "about five car lengths . . . about two hundred and forty, fifty feet at the most."

Defendant's engineer did not see plaintiff coming. He said: "As I was crossing Talcott Avenue, I noticed the foreman practically jump off or fall off of the front end of the engine. . . . And I used all the braking power I had, to stop, on account of him. I didn't know what was the matter." He also "saw a man run across the track ahead of the engine . . . just a few feet." He said that within 100 feet he probably could get the speed of the train down from thirty miles per hour to fifteen miles per hour, but that he did not think it could be done in fifty feet. The switch foreman said that approaching Talcott Avenue he "seen the truck there. It looked like he was going to try to beat us across. . . . He couldn't get across and he started up the eastbound main and we hit him about twenty-five feet over the crossing on the left side." He also said that it was light enough to "see a couple of blocks ahead" and that he did not know whether the headlight was "on or not on." The fireman said that at Talcott Avenue "the truck come out from behind this barbecue stand. It seemed to me he was going to make a full turn the way he was coming there about, I would say, fifteen to eighteen miles an hour, to the best of my knowledge; he was going to make a full turn to the west of both main lines. I reached over to view the water glass to see how my water was running, and steam. . . . Swung my head back. He just about had the crossing, lacking, I would say, three or four feet, to the best of my knowledge, and found out he couldn't make it and swung around in the eastbound main track." He further stated that plaintiff was "hugging the south curb, swinging out from the barbecue stand;" and that when it was struck "we didn't have but very little to hit the curb on the north side of the crossing." The head brakeman also said: "I seen the truck coming down Talcott, going east on Talcott. It looked to me like as if he was trying to beat us across the track and he seen he couldn't and headed north to avoid striking us." He further testified: "Q. This fellow turned to the left? A. Turned, headed north. Q. He didn't slow down? A. No, he didn't have time. . . . Q. The engine caught the extreme right rear corner of his truck. If the engine had slowed down it would have let him get that last foot of his truck out of your way. Isn't that right? A. Yes, sir."

■ I. We think that the facts above stated amounted to substantial evidence tending to show that plaintiff drove upon defendant's track, oblivious to the approach of its train, and that defendant's fireman saw or by the exercise of ordinary care could have seen that plaintiff was oblivious and was about to go into a position of imminent peril of being struck by the train, in sufficient time to have thereafter (after plaintiff's obliviousness and purpose to continue im-

mediately into a position of imminent peril became reasonably ap parent) with the means at hand warned plaintiff, or to have enabled the engineer to warn him, soon enough so that he could have stopped before reaching a place where the train would strike him. The fireman said that he saw plaintiff's truck come out from behind the barbecue stand. He must have at least seen plaintiff when he started up from his stop near the west side of the barbecue stand, if he did stop and the jury was entitled to believe that he did, if he saw him at that point. Then if he had continued to watch him instead of looking away he would have seen him under way at two miles an hour and increasing his speed as he proceeded, to between five and six miles per hour. The fireman said that he could start the bell ringing with the bell rope. He said it was ringing, but that too was for the jury. He could either have done that or called to the engineer in time for him to have sounded the whistle if he could not have reached it himself. [Herrell v. St. Louis-San Francisco Railroad Co., 322 Mo. 551, 18 S. W. (2d) 481; Chawkley v. Wabash Railroad Co., 317 Mo. 782, 297 S. W. 20.] If plaintiff started toward the track from a stop, or even if the fireman saw that he was increasing his speed, that would be some indication that he was oblivious to the approach of the train and intended to continue across the track. To be free from negligence under the humanitarian doctrine one must act on reasonable appearances at a time when action would be effective. [Womack v. Missouri Pacific Railroad Co., 337 Mo. 1160, 88 S. W. (2d) 368, and cases cited.] Such a case as Elkin v. St. Louis Public Service Co., 335 Mo. 951, 74 S. W. (2d) 600, cited by defendant, where the plaintiff drove slowly in a street intersection, without increasing speed or otherwise giving any appearance of intention to cross in front of defendant's street car, may be distinguished from this case on the ground that there was nothing in plaintiff's appearance there, from which it would reasonably appear that he "was oblivious of his danger or that he intended to drive his truck upon the track in front of the approaching street car." Starting from a stop toward a railroad track and moving at continuously increasing speed has a different appearance, as to obliviousness, than driving at the same slow rate of speed into and through a street intersection. The trainmen, who did watch plaintiff all the time said that it looked to them like he was going to try to beat the train across, so that he evidently did give the appearance of an intention to continue across the track.

Plaintiff's truck traveled more than thirty feet from where it was stopped before it reached the point between the tracks where he saw the train. This took four seconds or more, since it was not traveling at the maximum speed reached of about five miles per hour all of the time. During that time the train going at thirty miles per hour would have traveled at least 175 feet, and was still sixty to

seventy-five feet south of the crossing. It did not strike plaintiff until after he reached the eastern track, turned, and drove to the north. If the train was going faster, it could have traveled 200 feet or more, but the trainmen said that they could see a couple of blocks and 200 feet was less than one block. If they were running in the dusk without a light and plaintiff did have lights, that would have been some reason for them to believe that he was oblivious of their approach. We can only say that there is no case to be submitted to the jury under the humanitarian rule "if a given case in that regard is so plain that average fair-minded men cannot reasonably differ about it. . . . But if there is a ground for fair difference of opinion about it, then the question is for the jury." [Ellis v. Metropolitan Street Ry. Co., 234 Mo. 657, 138 S. W. 23; Logan v. C., B. & Q. Railroad Co., 300 Mo. 611, 254 S. W. 705; Homan v. Missouri Pacific Railroad Co., 334 Mo. 61, 64 S. W. (2d) 617; see, also, 335 Mo. 30, 70 S. W. (2d) 869; Kloeckener v. St. Louis Public Service Co., 331 Mo. 396, 53 S. W. (2d) 1043.] We hold that there was a submissible humanitarian case of failure to warn.

We also hold that there was substantial evidence to warrant submission upon the ground of failure to slacken speed. It is a reasonable inference from the evidence most favorable to plaintiff that he was almost successful in getting his truck out of the way by driving to the north along the track ahead of the train. [See Hoelzel v. C., R. I. & P. Railroad Co., 337 Mo. 61, 85 S. W. (2d) 126.] There would be no better evidence of what could have been done than what was actually done. Defendant's evidence was that the engineer did not start to put on the brakes until after a switch foreman jumped off the engine, at the crossing, to escape injury from a collision and that the train was nevertheless brought to a complete stop with the engine not more than 250 feet north of Talcott Avenue. Plaintiff's evidence was that he made the turn to the north after he saw the train about seventy-five feet from him. Thereafter, Wisa did have time to jump out of the truck and run across the track in front of the train to a place of safety. Since this street was 40 feet wide and plaintiff was crossing near the south side, if he was struck near the north side, it would not be unreasonable for the jury to believe that he traveled twenty or twenty-five feet to the north before the engine hit him. That would mean that he traveled from fifty-five to sixty feet altogether after starting up from the barbecue stand, and that the train traveled at least 100 feet, after he discovered it, before it struck him. They could have found, therefore, that there was as much as six or seven seconds in which to slacken the speed of the train, during which time it could have traveled from 275 to 300 feet. Of course, had warning been given immediately after plaintiff was seen to start toward the track, it probably would not have been necessary to slacken speed but, as the distance to the track was short, it

was for the jury to consider whether the circumstances required and made it reasonable to do either one or the other. [See State ex rel. Wabash Railroad Co. v. Bland, 313 Mo. 246, 281 S. W. 690.] If the train did stop in 250 feet from the point of collision, since there was evidence that its speed could have been reduced from thirty miles per hour to fifteen miles per hour in about 100 feet after the brakes were applied, and since only the left side of the pilot beam and cylinder struck the rear or side of the truck, we do not think we would be justified in holding, as a matter of law, that fair-minded men could not reasonably differ as to whether there was time for the engineer to slacken the speed, so that plaintiff could have escaped with his truck, had the fireman continued to watch plaintiff and immediately informed him of the peril after he could have then seen plaintiff approaching the track, apparently intending to cross, oblivious to the oncoming train. [Maginnis v. Missouri Pacific Railroad Co., 268 Mo. 667, 187 S. W. 1165; Steger v. Meehan (Mo.), 63 S. W. (2d) 109; Martin v. Fehsc, 331 Mo. 861, 55 S. W. (2d) 440; Gray v. Columbia Terminals Co., 331 Mo. 73, 52 S. W. (2d) 809; Bollinger v. St. Louis-San Francisco Railroad Co., 334 Mo. 720, 67 S. W. (2d) 985; Hencke v. St. L. & H. Railroad Co., 335 Mo. 393, 72 S. W. (2d) 798; Todd v. St. Louis-San Francisco Railroad Co. (Mo.), 37 S. W. (2d) 557; Hoelzel v. C., R. I. & P. Railroad Co., supra; Kloeckener v. St. Louis Public Service Co., surpa; Alexander v. St. Louis-San Francisco Railroad Co., 327 Mo. 1012, 38 S. W. (2d) 1023.] We, therefore, hold that the court properly overruled defendant's demurrer to the evidence.

II. Defendant also contends that plaintiff's main instruction (No. I) was erroneous. This instruction, after requiring the finding of the collision and plaintiff's injuries continued as follows:

"And if you further find that at and prior to the collision aforesaid the plaintiff and the said automobile truck were approaching and in a position of imminent peril of being thus struck and injured by said train and that the defendant saw, or by the exercise of ordinary care on its part could have seen plaintiff and said automobile truck approaching and in a position of imminent peril of being struck as aforesaid, if you do so find, in time thereafter for the defendant in the exercise of ordinary care with the means and appliances at hand, and with reasonable safety to said train and the persons thereon, to have slackened the speed of said engine, and to have sounded an audible warning of its approach and proximity and that by so doing, if you so find, said collision and the injury to plaintiff would thus and thereby have been avoided; and if you further find that the defendant did fail to slacken the speed of said engine under the circumstances aforesaid, if you do find, and that the defendant did fail to sound an audible warning of the approach of said engine, and its proximity under the circumstances aforesaid, if you do so

find, and that in thus failing, if you so find, the defendant did fail to exercise ordinary care and was guilty of negligence, and that the plaintiff was injured as a direct and proximate result of the aforesaid negligence on the part of the defendant (if you find that under the circumstances aforesaid the defendant did fail to slacken the speed of its engine, and to give an audible warning of its. approach and proximity) then your verdict will be in favor of the plaintiff.''

The objections leveled at this instruction are that (1) it failed to require a finding that plaintiff was not aware of the approach of the train (obliviousness); (2) that it failed to require a finding as to where the position of imminent peril began; and (3) that it failed to require a finding that the speed of the train could have been slackened in time (after plaintiff was or could have been in peril) to have avoided a collision. A mere reading of the instruction will show there is no merit to the latter objection.

In the case of Banks v. Morris & Co., 302 Mo. 254, 257 S. W. 482, l. c. 484, we held that the constitutive facts under the humanitarian rule are as follows:

''(1) Plaintiff was in a position of peril; (2) defendant had notice thereof (if it was the duty of defendant to have been on the lookout, constructive notice suffices); (3) defendant after receiving such notice had the present ability, with the means at hand, to have averted the impending injury without injury to himself or others; (4) he failed to exercise ordinary care to avert such impending injury; and (5) by reason thereof plaintiff was injured.''

''Under this doctrine 'the position of peril' is one of the basic facts of liability, it might be denominated the chief one. [State v. Trimble, 253 S. W. 1014, 1019.] It is of no consequence what brings about or continues the situation of peril. It may be through the obliviousness of the one imperiled, or through his inability to extricate himself from his environment, or through his efforts to rescue another, or through his sheer hardihood or recklessness.'' [Banks v. Morris & Co., supra.]

A plaintiff in his petition need only plead the ultimate facts relied on to state his cause of action. It is not necessary for him to plead his evidence, in fact, good pleading requires the evidence by which the pleader proves the ultimate facts of his cause of action be eliminated from his pleading. [Mooney v. Monark Gasoline & Oil Co., 317 Mo. 1255, 298 S. W. 69.]

From the above formula it is unnecessary for a plaintiff to plead that he was oblivious to his peril. As to what caused the peril is a matter that the plaintiff must show by his evidence. If obliviousness is the cause of his peril, it is necessary for him to prove it.

''In some instances obliviousness of danger on the part of the plaintiff is necessary to make the situation in which he is placed one of peril. In such cases it is of course incumbent upon the plaintiff to

make proof of the facts and circumstances tending to show obliviousness, not only for the purpose of establishing that he was in a position of peril, but to bring home·to defendant a knowledge of his peril. *In these cases, however, obliviousness is but a subsidiary or evidentiary fact, the perilous situation of plaintiff and the defendant's knowledge of it are the ultimate, issuable facts. Such facts and only such facts must be pleaded. Matters of evidence have no place in a pleading. This is elementary law.*" [Banks v. Morris & Co., supra.] (Italics ours.)

As the petition in a case under the humanitarian rule does not have to allege "obliviousness," "the necessary corollary thereto is that the instructions do not have to cover anything which the pleadings do not cover." [Karte v. J. R. Brockman Mfg. Co., 247 S.,W. 417, also, Wenzel v. Busch, 259 S. W. 767.]

This instruction does require the jury to find that the plaintiff was in "a position of imminent peril," and that was the ultimate or issuable fact for the jury to determine. It is true the words "imminent peril (are) not defined. These are ordinary English words and require no definition." [Bryant v. Kansas City Rys. Co., 286 Mo. 342, 228 S. W. 472.]

We have not been cited to a single case that holds that it is error if the instruction fails to require the jury to find the plaintiff was oblivious to his danger when the instruction required the jury to find that the plaintiff was in a position of peril.

In the case of Karte v. J. R. Brockman Mfg. Co., 247 S. W. 417, 423, we said:

"Counsel for defendant also contends that the petition did not state a cause of action, because it failed to state that deceased was oblivious to the approaching danger, and that plaintiff's Instruction A was erroneous, because it did not require the jury to find that the deceased was oblivious to the danger that was approaching him. . . . The existence of such a rule would require the plaintiff to plead that deceased was not guilty of contributory negligence, which is not the law of this State. This is so well settled that the citation of authorities is wholly unnecessary, and the necessary corollary thereto is that the instructions do not have to cover anything which the pleadings do not cover.

"The same doctrine is sometimes stated in this language: The petition must state facts sufficient to constitute a cause of action, and the evidence must prove the existence of those facts and the instructions must submit those facts to the jury. The instructions must not be broader nor narrower than the petition; if they require more to be proven than those stated in the petition, then they are erroneous as to plaintiff, because they require him to prove more than the law requires him to do, or if the instructions should permit him to prove less than the petition must state to constitute a cause of action,

then they would be erroneous, in so far as the defendant is concerned, for under such state of facts the plaintiff would not be required to prove some of the facts which constitute a cause of action, and which under the law must be stated in the petition.

"The foregoing observations are almost self-evident, and need no further argument."

In the case of Wenzel v. Busch, 259 S. W. 767, 770, we said:

"If the plaintiff was not oblivious to his danger of being struck by the automobile, but was aware of it, and could by the exercise of ordinary care have escaped therefrom, and failed to do so, he was guilty of contributory negligence which would bar his recovery, but it was not necessary for him to allege he was free from such contributory negligence; that was a matter which defendant must allege and prove. Consequently, it was not required that the petition should state that plaintiff was oblivious to his position of peril or danger. We have recently so ruled, and do not wish to recede from that ruling. [Karte v. Brockman (Mo.), 247 S. W. 417.]

"As to plaintiff's Instruction No. 2. The instruction follows the petition and reads:

" 'If you further find from the evidence that said Birschkus, by keeping a vigilant watch, if you find from the evidence he failed to do so, would have seen plaintiff on or moving toward the portion of said street over which said automobile was about to be operated and in peril of being struck thereby, if such you find from the evidence, and in the exercise of ordinary care in stopping said automobile, etc., could have avoided injury to plaintiff, your verdict will be in favor of the plaintiff . . . and the fact alone, that plaintiff was negligent, will not prevent his being entitled to a verdict, if you find him otherwise entitled to a verdict, under this instruction.'

"For the same reason that the petition need not allege plaintiff was oblivious and could not extricate himself and thereby caused plaintiff to assume the burden of disproving contributory negligence, said instruction need not do so. It was therefore not erroneous in the matter complained of by the appellants."

In the case of Jordan v. St. Joseph Ry., L., H. & P. Co., 335 Mo. 319, 73 S. W. (2d) 205, 208, we said:

"Unless plaintiff was oblivious to his peril, a warning signal could do no good. However, an examination of the instruction in question shows that it is not deficient in this respect. The instruction plainly requires a finding that the motorman not only saw, or should have seen, the plaintiff in a position of danger and imminent peril as he approached the street car track, but that the motorman also knew, or should have known, that the street car would collide with the automobile unless the motorman sounded the gong and thereby warned plaintiff of the proximity of such car. This expresses the idea conveyed by the term 'oblivious to his danger' even more forcibly than

would be done by the use of that term. Requiring the jury to find that plaintiff in approaching the street car track was oblivious to his danger, or rather that the motorman saw and knew he was so oblivious, would mean no more than that the motorman saw and knew that plaintiff was not going to stop before going upon the car track unless something was done to apprise plaintiff of his peril, and this the instruction required the jury to find.''

In the case of Clark v. Atchison, T. & S. F. Railroad Co., 319 Mo. 865, 6 S. W. (2d) 954, 960, we said:

''In view of the evidence we see nothing wrong with Instruction 2. That Clark was in a position of imminent peril was a constitutive element of the cause of action, one of the ultimate facts which it was necessary for plaintiff to plead and prove . . . and which, of course, it was necessary for the jury to find in order to warrant a verdict in her (plaintiff's) favor.''

In the case of Montague v. Missouri & K. I. Railroad Co., 305 Mo. 269, 264 S. W. 813, is a case to the same effect.

The defendant relies upon the case of Pentecost v. St. L. Merchants' Bridge Terminal Railroad Co. et al., 334 Mo. 572, 66 S. W. (2d) 533. That case is not in point because it was ruled on the demurrer to the evidence. The propriety of an instruction was not involved. We held that the demurrer to the evidence should be sustained because the plaintiff was not oblivious of the approach of the train, and therefore, the defendant was not negligent, under the humanitarian rule, for its failure to sound the whistle.

██ Instructions must all be read together, and if Instruction No. 1 was lacking in clearness in this respect, it was made clear by defendant's Instruction No. 4 which required the jury to find ''that plaintiff was not conscious of the approach of said train'' and the persons in charge of said train knew such fact. [Jordan v. St. Joseph Ry., L., H. & P. Co., supra.]

Nor do we think the instruction is erroneous because it failed to require a finding as to where the position of imminent peril began. If we understand the defendant's position correctly, it would require the court to instruct the exact place where the position of peril began. In other words, it would require the court to say in the instruction that under the circumstances plaintiff's position of peril did not begin until he was within a certain distance from the track. The exact point where the position of peril began was for the jury to determine under the evidence.

In the case of Allen v. Kessler, 64 S. W. (2d) 630, 633, we said:

''The jury could well find that there was some place and time when, in the exercise of due care, the driver could and should have used the appliances at hand to avoid striking plaintiff by either giving a warning of his approach, checking the speed, or stopping the car.

. . . These were questions for the jury and its verdict meets with our approval.''

In the case of Kloeckener v. St. Louis Public Service Co., 331 Mo. 396, 53 S. W. (2d) 1043, 1044, we said:

''Where the danger zone commenced was a question for the jury under the facts and circumstances of this case.''

We hold that this instruction is not subject to the criticisms made by the defendant.

■ III. The defendant contends that the court erred in refusing to give the following instruction:

''The court instructs the jury, that the defendant railroad and its operators were not required by law both to ring the bell and to blow the whistle for the road crossing, but that the doing of either one on the occasion in question complied with the law.''

This instruction was properly refused, because we are here dealing with a cause of action under the humanitarian rule and not one based on primary negligence (violation of the statute). The former rule requires a warning to be given that will be given effective to overcome the plaintiff's obliviousness. If the ringing of the bell is not sufficient, then it is the duty of the trainmen to blow the whistle. [Rollison v. Wabash Railroad Co., 252 Mo. 525, 160 S. W. 994.]

■ IV. Plaintiff's attorney, in his opening statement informed the jury he was suing for $35,000, and defendant assigns this as error. It is true we have held that the pleadings should not be read to the jury. Also, we have condemned the giving of an instruction which told the jury they cannot allow damages in excess of the amount sued for in the petition. We see no error, for plaintiff's attorney to state the amount asked for in the petition in the opening statement. It was only the statement of an advocate, and is not on the same footing as an instruction of the court. We rule this is not error.

■ V. Defendant complains of a statement of plaintiff's attorney in his closing argument. As he withdrew the statement, we will not set it out. ''The trial judge, having heard all the arguments, is in a much better position to know whether an improper influence has been exerted than the appellate court can possibly be.'' [Gettys v. American Car & Foundry Co., 16 S. W. (2d) 85, 322 Mo. 787.]

■ VI. The defendant contends that the verdict of $20,000, is excessive.

The plaintiff received his injuries on April 8, 1934. At the time of the accident, the plaintiff was about twenty-four years old and his previous health had been good. His occupation was that of a crane operator and while employed he earned between $150 and $165 a month. Due to the depression he had not been so employed for several months. But at the time of his injury he had been hauling ashes

and earning between $25 and $30 a week. After he was injured, he worked for the C. W. A. from December, 1933, to the middle of May, 1934, earning $20.40 a week.

The injuries that the plaintiff complained of are a healed fracture of the superior ramus of the right pelvic bone, which is not in line but united, and a fracture at the crest of the right ilium, where it joins the spine, which is united. He has functional neurosis, which is caused by his mental attitude. His right leg is shortened one-half inch. He had pyelitis but that cleared up at the time of the trial. He has inflammation in the bladder which apparently clears up and returns. The union of the pubic bone and the ilium is firm and there was some evidence of injury to the soft structure at that part of the body. There is some limitation of the movement of the hip. He had a heavy scar on his chin, nose and the lower part of his back. There was some evidence of an injury to the deep urethea, and at the time of the trial there was some evidence of red blood cells in his urine. The plaintiff was in a hospital at various times, a total of about thirteen weeks. There was evidence that he would be unable to do heavy manual labor. At the time of the trial he was about thirty pounds under weight. We have examined the authorities cited by both plaintiff and defendant and have come to the conclusion that this verdict should not exceed $15,000, and for that reason will reverse and remand the cause for a new trial unless the respondent will enter a *remittitur* of $5000, within ten days after the delivery of this opinion, but if the *remittitur* is so entered within that time the judgment will be affirmed, as of the date of the original judgment

*Collet, Leedy* and *Hays, JJ.,* concur; *Ellison, C. J.,* dissents in separate opinion; *Gantt, J.,* dissents in separate opinion; *Frank, J.,* dissents and concurs in separate dissenting opinion of *Gantt, J.*

GANTT, J. (dissenting).—I do not agree to the ruling of the principal opinion on plaintiff's Instruction No. 1 for reasons stated by Commissioner HYDE as follows:

I do not agree with Part II of this opinion, because the approval of the instruction, therein discussed, is in necessary effect a holding that, as to the element of "obliviousness," there is no distinction between a case where a person is *in* a position of imminent peril and one where a person is only *approaching* a position of imminent peril. I fully agree that "obliviousness" is not an essential ultimate fact necessary to make a humanitarian negligence case where the proof shows that the plaintiff was *in* a position of imminent peril. I do not agree with the holding herein that "obliviousness" is not a necessary ultimate fact to make a case where one is only *approaching* a position of imminent peril; and where, as here, he would not have been in any danger of injury at all, while approaching at a distance within which warning could have prevented his injury, unless he was oblivious.

The opinion herein is based upon the authority of Banks v. Morris & Co., 302 Mo. 254, 257 S. W. 482. I cannot agree that Banks v. Morris, supra, is really an authority for such conclusion, because it does not decide a case of a person *approaching* a position of peril. In that case, the plaintiff was in the direct path of an approaching vehicle but in spite of frantic efforts was unable to escape from it. The opinion said that plaintiff there "was not oblivious to the menace of the oncoming truck; on the contrary, she was keenly alive to it. . . . She tried to get out of its path. As she could not go forward (because of other traffic) she attempted to run back. . . . (The truck driver) came directly on, neither slowing down, nor turning to right or left. . . . He left it to her to extricate herself as best she could—to take wing if necessary to get out of his road." Of course, being unable to fly, the plaintiff there was *in* a position of imminent peril—helpless and in inescapable peril.

If "obliviousness" had been held as essential ultimate fact in that case, an outright reversal of the plaintiff's judgment would have been required. The law clearly could not require such a result, so what was there decided and all that could have actually been decided was that "obliviousness" was not and could not be an essential element necessary to make a case, when a person was *in* a position of inescapable peril. That is absolutely right but any language therein broad enough to apply to a case of *approaching* a position where he would be in such peril, if he continued, could be nothing more than *obiter dictum*. I submit that being *in* a position of imminent peril and being in a danger zone because of *approaching* such a position is not the same thing. I think there are great and essential differences between these two classes of cases, and that they impose different duties and call for different rules of liability. This is recognized by the American Law Institute in its Restatement of Torts, which separately classifies and discusses these two situations. [Restatement of Torts, secs. 479 and 480; see, also, discussion of Restatement, sec. 480, in Womack v. Missouri Pacific Railroad Co., 337 Mo. 1160, 88 S. W. (2d) 368.]

When a person is in the direct path of a vehicle approaching so swiftly that he is helpless to escape it solely by his own efforts without action (to stop, slacken speed or swerve) on the part of the driver, he is, of course, *in* a position of imminent peril. In such circumstances it is not difficult for laymen to understand the meaning of the undefined term "*in* a position of imminent peril." However, the humanitarian doctrine is not and should not be limited to that situation. It is and should be applied also to cases where a person is not yet "*in* a position of imminent peril," but is merely approaching such a position without knowledge of the danger that makes it perilous to do so. In such cases, a duty to act is imposed upon the driver to act before the approaching person actually gets "*in* a posi-

tion of imminent peril.'' The driver, who sees (or ought to see under the Missouri rule) a person approaching the path of his vehicle, is required to act when such person enters what is called the danger zone, which extends beyond the place where he would actually be ''*in* a position of imminent peril'' and includes territory within which only knowledge of danger is necessary to enable such approaching person to himself keep from ever actually getting ''*in* a position of imminent peril,'' and to solely by his own acts himself prevent his injury without any action by the driver except overcoming his obliviousness of danger.

The instruction, authorizing a verdict for plaintiff approved here, did not require either a finding that plaintiff, while approaching the path of defendant's train, was oblivious to its approach, or that the defendant's employees in charge of the train saw, or by the exercise of due care could have seen, that plaintiff was oblivious or even appeared to be oblivious thereto, in time to have thereafter avoided his injury by warning him or slackening speed. This instruction is held sufficient upon the authority of the formula, in Banks v. Morris, supra, stating the essential facts which are required to make a humanitarian negligence case when a person is ''*in* a position of imminent peril.'' This instruction authorized the jury regardless of ''obliviousness'' or any appearance of obliviousness, to find for plaintiff if ''*at and prior to* the collision (this language is criticized in Rytersky v. O'Brine, 335 Mo. 22, 70 S. W. (2d) 538, and Williams v. St. Louis Public Service Co. (Mo. App.), 54 S. W. (2d) 764)' . . . plaintiff (and his truck) were *approaching and in* a position of imminent peril of being stuck;'' and that ''defendant saw or by the exercise of ordinary care on its part could have seen plaintiff and said automobile truck *approaching and in* a position of imminent peril of being struck,'' and *thereafter* failed to act as hypothesized. It is my view that the formula of Banks v. Morris, supra, ought not to apply and cannot logically be applied to a person who is only *approaching* a position of imminent peril. The humanitarian doctrine always applies to a person who is *in* a position of imminent peril, and it never makes any difference whether he knows of the peril or not; but it applies, only under certain circumstances, to a person *who is approaching* such a position, and his knowledge of danger, except under most unusual circumstances, makes the difference between liability and non-liability. Is it not, in fact, a physical impossibility for a person to be *in* and *approaching* a position of imminent peril at the same time? How can he be *in* a position of imminent peril when merely *approaching* a position of danger with ability to stop before reaching it? How can a person only be *approaching* a position of imminent peril *at* (the very moment of) *the collision?* What can the defendant do *thereafter* to prevent injury to a person who gets *in* a position of imminent peril *at* (the moment of)

the collision? Does not the failure of this instruction to distinguish between the vastly different situation of a plaintiff and requisite duties of a defendant, "*at* and *prior to* the collision" and "*approaching* and *in* a position of imminent peril," make it so inconsistent, confusing and misleading that no one could intelligently follow it or tell what finding it required? [See italicized portion of instruction condemned in Lamoreux v. St. L.-S. F. Railroad Co., 337 Mo. 1028, 87 S. W. (2d) 640, l. c. 642:] Would not a jury reasonably believe from it that it was the duty of trainmen to slacken the speed of their train and give warning whenever they saw anyone approaching the track whether oblivious or not? I think that it entirely fails to give them any definite idea of when, where, or under what circumstances the duty to act commences.

What is it that widens the danger zone beyond the path of a moving vehicle when a person is approaching its path? Is it not always widened by obliviousness and, except under unusual circumstances, only by obliviousness? This court has (even since Banks v. Morris, as it did before) consistently held that obliviousness is an essential element of a humanitarian negligence case based on failure to warn. [Phillips v. St. L.-S. F. Railroad Co., 337 Mo. 1068, 87 S. W. (2d) 1035; Jordan v. St. J. Ry., L., H. & P. Co., 335 Mo. 319, 73 S. W. (2d) 205; Pentecost v. St. L., M. B. T. Railroad Co., 334 Mo. 572, 66 S. W. (2d) 533; State ex rel. Weddle v. Trimble, 331 Mo. 1, 52 S. W. (2d) 864; Driscoll v. Wells (Mo.), 29 S. W. (2d) 50; Clay v. Missouri Pacific Railroad Co. (Mo.), 5 S. W. (2d) 409; Wood v. Wells (Mo.), 270 S. W. 332.] How could it be held otherwise? Without obliviousness, failure to warn could not possibly be the proximate cause of injuries.

In Homan v. Missouri Pacific Railroad Co., 334 Mo. 61, 64 S. W. (2d) 617, (Banc), it is held that the danger zone of one approaching a railroad track commenced where the trainmen "saw, or could have seen by the exercise of ordinary care, that the driver . . . was intent on pursuing his journey across the track, oblivious to the danger." [See, also, Smith v. K. C. Pub. Serv. Co., 328 Mo. 979, 43 S. W. (2d) 548 (Banc).] If one is in peril because of obliviousness, and if his actions are such that the defendant has reasonable cause to believe that he is oblivious, then the duty arises first to warn so that he can by his own efforts keep out or get out of danger, and if that does not cause him to act or does not appear likely to get him notice in time to get out of or keep from going into danger, then to slacken speed. There may be time to do both. Often where danger is due to obliviousness of one approaching the path of a vehicle, there is not time to stop. In Homan v. Missouri Pacific Railroad Co., supra, ability to stop was shown. Of course, overcoming obliviousness is not necessarily required. If a defendant can avoid striking an oblivious person moving across his path by slackening speed so that he will be

out of the way before defendant's vehicle reaches the place where such person is crossing, he performs his full duty by so doing although such person continues on his way still oblivious. This no doubt happens every day with automobile traffic, but it is the obliviousness (and reasonable appearances thereof) of the approaching person and not merely his approach, which creates the duty to act to either warn or slacken speed.

There are conceivable circumstances where the danger zone could be widened without obliviousness. It is possible that a person knowing that he is approaching the path of another vehicle or instrumentality could nevertheless be helplessly approaching a position of imminent peril of being struck by it; for example, a person in a vehicle out of control or a boy on a sled, unable to turn out of a rut or track and going too fast to stop. Such circumstances would widen the danger zone without obliviousness. A case which at first glance seems to thus widen the danger zone, without obliviousness, is Bode v. Wells, 322 Mo. 386, 15 S. W. (2d) 335 (Banc), where the plaintiff, a woman desiring to board a street car at a usual stopping place, ran to cross the track ahead of it waving an uplifted umbrella as a signal to stop for her. The platform for passengers was on the other side of the track; it was the duty of the motorman to be on the lookout there for this exact situation; but he did not do so and the car did not stop. Clearly, approaching with such signals, indicated the plaintiff's intention to cross. There was neither any reason for her to believe that she could not safely do so, nor any reasonable ground for the motorman to make any other assumption. Plaintiff had the right to expect that the car would stop short of her crossing place and was clearly unaware that it would not do so. It was held that the danger zone was wider than the track. It might well be said that the plaintiff in this case was oblivious; that is, although she knew the car was moving toward her crossing place, she was without knowledge that the car would take the unusual and unexpected course which resulted in the injury. The point is that, when a person is approaching the path of a moving vehicle, only most unusual circumstances can widen the danger zone beyond its path without obliviousness of its approach, but that obliviousness always thus widens the danger zone.

In Banks v. Morris, there was a humanitarian case after the plaintiff was *in* a position of imminent peril because there was, *thereafter*, time for effective action by the driver. In the case at bar, there is no possibility under the evidence of a submissible case of humanitarian negligence, after plaintiff reached the place where he was *in* a position of imminent peril due to his helplessness to get out of its way thereafter solely by his own efforts. When this situation arose, it would have to be ruled as a matter of law that there was not sufficient time, thereafter, for defendant's engineer to have avoided injury

to plaintiff by slackening speed; and warning at that time of course could have accomplished nothing. Therefore, plaintiff here· can only make out a case of humanitarian negligence on the theory of being in the danger zone of reasonably certain injury because of his obliviousness while *approaching* a position of imminent peril, with ability by his own efforts to prevent any injury to himself if he only knew of the danger. In other words, the danger zone in which plaintiff would have been *in* a position of imminent peril, due to helplessness to get out in time by his own efforts, was too narrow under this record to make a case; but the danger zone where plaintiff was in danger of injury due to his obliviousness, unless defendant did something (warning) to overcome his obliviousness while he could still help himself, or did something· (slacken speed) to make his obliviousness harmless to him, was wide enough to permit time for effective action to prevent his injury, either by warning him so that he could stop, or by slackening speed so that he could pass over the crossing before the train reached it. How narrow the danger zone is, when a person *approaching* the path of an oncoming vehicle is not oblivious, was shown by this court's opinion in McGowan v. Wells, 324 Mo. 652, 24 S. W. (2d) 633, which states that if a plaintiff, approaching a street car track, "saw the street car all the time, knew it was continuing at undiminished speed, and yet with this knowledge walked directly into its path," he "·did not enter the danger zone until he took the last step or so before going into the course the car would take." In other words, the humanitarian rule did not require action by the operator of the car in that case until the plaintiff was *in* a position of imminent peril; namely, close enough to the track to be struck by the overhang of the car if he took another step, and appearing about to do so.

Does this not demonstrate the reason why the formula set out· in Banks v. Morris, supra, cannot fit this case, or any other case where the humanitarian doctrine is applicable to a person only approaching a position of imminent peril? In the case of a person, who, with ability to stop, is only *approaching* a position of imminent peril, the real cause of danger of injury is "obliviousness." If he is not oblivious he neither is in .a position of any kind of peril, nor in a danger zone at· all. Many cases hold 'that a case should not be submitted upon humanitarian negligence, if the evidence shows that the plaintiff was not oblivious or even if there was a failure to show a reasonable appearance of obliviousness. [Elkin v. St. Louis Public Service Co., 335 Mo. 951, 74 S. W. (2d) 600; Roberts v. Consolidated Paving & Material Co., 335 Mo. 6, 70 S. W. (2d) 543; Cavey v. St. J. Ry., L., H. & P. Co., 331 Mo. 882, 55 S. W. (2d) 438; Ziegelmeier v. St. L.-S. F. Railroad Co., 330 Mo. 1013, 51 S. W. (2d) 1027; Sullivan v. A., T. & S. F. Ry. Co., 317 Mo. 996, 297 S. W. 945; Driscoll v. Wells (Mo.), 29 S. W. (2d) 50; State ex rel. Wabash Railroad Co. v. Bland,

313 Mo. 246, 281 S. W. 690.] The American Law Institute's Restatement of Torts states the rule applicable to *approaching* cases (I think the above-cited cases show that it is the Missouri rule), as follows: "It is not enough that the defendant should see the plaintiff in a position which would be dangerous were the plaintiff not aware of what is going on. The defendant must also realize or have reason to realize that the plaintiff is inattentive and, therefore, is in peril." Therefore, it seems to me to be wholly wrong to say that, in such a case, obliviousness is not an essential ultimate fact.

When is a person *in* a position of imminent peril? In Banks v. Morris, supra, the separate concurring opinion of Judge WHITE says it is when there is "no time for deliberation on the part of the person in peril between its appearance and the impending calamity" and "when the ordinary and natural effort to be expected in such person would not put him in a place of safety;" and he further stated that "a person in full possession of his faculties, standing on a railroad track with a train approaching 200 yards away and due to arrive in 10 seconds would not appear *in* imminent peril." [See Ziegelmeier v. East St. Louis & S. Railroad Co., 330 Mo. 1013, 51 S. W. (2d) 1027; Ridge v. Jones, 335 Mo. 219, 71 S. W. (2d) 713; Wallace v. St. J. Ry., L., H. & P. Co., 336 Mo. 282, 77 S. W. (2d) 1011.] In Clark v. A. T. & S. F. Ry. Co., 319 Mo. 865, 6 S. W. (2d) 954, where a person was walking on a railroad track toward an approaching train, Judge RAGLAND, who wrote the opinion adopted in Banks v. Morris & Co., recognized the correctness of the definition by Judge WHITE therein and reversed the Clark case because the trial court had refused an instruction which said that defendant's trainmen "were not obliged to warn said Clark, nor to stop or slacken the speed of the engine unless and until either the engineer or fireman saw, or by the exercise of ordinary care on his part would have seen, that said Clark was not conscious of the approach of said train and was in danger of being struck by it, and that he did not intend to get out of its way." The Clark opinion says: "If Clark saw the train coming or knew that it was coming, he was not *in* a position of imminent peril. Although a person may be in the pathway of approaching danger, yet, if he is fully cognizant of it and has the present ability to easily avoid it, he is not *in* a position of imminent peril within the rule." [See, also, Jordan v. St. Joseph Ry., L., H. & P. Co. (Mo.), 38 S. W. (2d) 1042; Stanton v. Jones, 332 Mo. 631, 59 S. W. (2d) 648; Worth v. St. L.-S. F. Railroad Co., 334 Mo. 1025, 69 S. W. (2d) 672; State ex rel. Wabash Railroad Co. v. Bland, supra.]

If that is true of a person in the direct path of a train, is it not also true of a person who is merely approaching the path of a train? If it is true, how can it be said that obliviousness is not an essential element that the plaintiff must prove to make a case when he is *approaching* its path, and which the jury must find in order to reach

a verdict in his favor? The decisions of this court, although generally following the rule, have failed to clearly state this obvious distinction between this class of cases and Banks v. Morris & Co. This has brought about confusion, and instructions, which hypothesize wholly inconsistent situations, in an attempt to bring *approaching* cases within Banks v. Morris & Co.

My conclusions are that a plaintiff is not *in* a position of imminent peril unless he is in a position from which he does not have time or ability to escape solely by his own efforts; that when he is *in* a position of imminent peril obliviousness is not an ultimate fact in his case because it is wholly immaterial and not an essential fact to make a jury case; that this would likewise be true of a person who is helplessly *approaching* a position of imminent peril under circumstances which render him unable to stop his approach; but that obliviousness necessarily is and should be held to be an essential ultimate fact which must be proved in order to make a case in all situations where a plaintiff is approaching a track or path, of a moving vehicle, with ability to stop and (if he knew of it) avoid any danger therefrom solely by his own efforts. This must be true because, in this last situation, a person cannot possibly be in a zone of danger therefrom unless he is oblivious of it. I think that an instruction should only hypothesize "*in* a position of imminent peril" when a person is unable to escape the danger solely by his own efforts (as Judge WHITE stated it in Banks v. Morris & Co., "when the ordinary and natural effort to be expected in such person would not put him in a place of safety);" and that when a person is only *approaching* the path of a vehicle (in the danger zone therefrom if he is unaware of its approach) an instruction should hypothesize *approaching* a position of imminent peril but not *in* a position of imminent peril. I think that an instruction authorizing a verdict in the latter case should require the jury to find both that the plaintiff was oblivious and that the reasonable appearances of the situation were such that those, in charge of the vehicle he was approaching, knew or by the exercise of the required degree of care could have known thereof in time to have, thereafter, by appropriate action, prevented his injury. I think that failure of such an instruction to require such finding should be held to be reversible error.

This error could not be cured or made harmless by the instruction given, at defendant's request, requiring a finding for defendant unless the jury did find that plaintiff was oblivious of the train as he approached the track. Plaintiff's instruction to find in his favor without any requirement to find that he was oblivious caused the two instructions to be in direct conflict as to this essential fact issue.

The decisions of this court on the question of when instructions can be harmonized and read together were reviewed in McDonald v.

Kansas City Gas Co., 332 Mo. 356, 59 S. W. (2d) 37, and the rule stated thus:

"It has long been settled that instructions must be read and construed together and 'that where a series of instructions, taken together, contain a complete exposition of the law, and cover every phase of the case, the verdicts obtained thereon will be sustained, even though the instructions, when taken separately, may be incomplete, and open to objection and criticism.' (Citing cases.) Therefore, if the plaintiff's instruction, covering the whole case and authorizing a verdict, does require the finding of all essential elements of the plaintiff's case, but states some of these indefinitely or ambiguously or in language which might be misleading, then an instruction on the part of the defendants which clearly and specifically requires the finding of essential elements does not conflict with the plaintiff's instruction, but instead makes it clear and definite. When all of the instructions thus harmonize and when read together correctly state the law, any such indefinite, ambiguous or misleading language in the plaintiff's instruction is cured by the other instructions. (Citing cases.)"

It is equally well settled, as therein also stated that: "an instruction, purporting to cover the whole case and authorize a verdict, is erroneous if it leaves out any facts necessary to be found before the plaintiff is entitled to recover, and that, where an instruction does leave out such an essential fact, the error is not cured by an instruction for defendant requiring a finding of such a fact before recovery can be had against it. This is because the two instructions would be conflicting, since the plaintiff's instruction would authorize a verdict for the plaintiff without finding such vital fact, while the defendants' instruction would inform the jury that they could not find a verdict for the plaintiff without finding such a vital fact."

Of the cases, quoted from in Part II of the opinion, only Jordan v. St. Joseph Ry., L., H. & P. Co., 335 Mo. 319, 73 S. W. (2d) 205, and Kloeckener v. St. Louis Public Service Co., 331 Mo. 396, 53 S. W. (2d) 1043, are true cases where a danger zone while *approaching* a position of peril is essential to a jury case, as is the case herein. In the Kloeckener case, the evidence showed that the plaintiff was oblivious of the street car and the instruction required a finding of obliviousness. The Jordan case holds that "the element of obliviousness *is essential* to a case on the humanitarian doctrine for failure to warn;" the evidence therein showed obliviousness; and it held, not that a finding of obliviousness was unnecessary, but that the wording of the instruction therein "expresses the idea conveyed by the term 'oblivious to his danger' even more forcibly than would be done by the use of that term." While I question this conclusion as to how clearly the language therein expresses the idea, I agree that the idea conveyed, rather than any fixed words, is what makes an instruction good.

Allen v. Kessler (Mo.); 64 S. W. (2d) 630, and Wenzel v. Busch (Mo.), 259 S. W. 767, were cases where pedestrians made good cases (similar to Banks v. Morris) of being *in* a position of imminent peril from automobiles; that is, the facts show that the drivers, in each case, had time to prevent any injury by swerving (if nothing else) after such pedestrian was actually *in* a position of imminent peril. It would seem that in Bryant v. Kansas City Rys. Co., 286 Mo. 342, 228 S. W. 472, there was time to stop (a street car running upgrade at a very slow speed) after plaintiff, a child three and one-half years old, got on the track. The court did not there hold that obliviousness was not an essential element of a humanitarian case, but considered that anyone ought to know that a three and one-half year old child was oblivious to such danger. Nevertheless, the instruction authorizing a verdict therein did require the jury to find obliviousness.

Karte v. Brockman Mfg. Co. (Mo.), 247 S. W. 417, was an intersection collision where an automobile struck a motorcycle and killed the rider. Even there, it seems that a jury case could have been made, after the motorcycle rider got *in* a position of imminent peril, because the driver had time thereafter to avoid injury to him by swerving. Therefore, as to that part of the case, at least, obliviousness was immaterial. As to a danger zone case, even the defendant's evidence showed that the rider was oblivious and the court said that, if it was necessary to show obliviousness, this "might be taken as a conceded fact in the case;" so if obliviousness was conceded there also was, unquestionably, a good case based on a danger zone while *approaching* a position of imminent peril. However, the conclusion stated in the opinion therein as to obliviousness is wholly *non sequitur*. It is there said that to require the petition to plead (and to require a finding in instructions) of obliviousness, in that case, "would require the plaintiff to plead that the deceased *was not guilty* of contributory negligence." That is just the reverse of what it would require, because while a finding of obliviousness of the deceased as to the oncoming automobile, which he could have seen if he had looked, might show that he *was guilty* of contributory negligence, it could not possibly show that he *was not guilty* thereof. The fact is, of course, that in most cases of *approaching* the path of a moving vehicle, the person *approaching* is oblivious thereto because of his own negligence (which often would even be contributory negligence as a matter of law), but such negligence is not available to the driver of such vehicle as a defense to a case based upon his failure to *thereafter* do what is required of him by the humanitarian negligence rule.

Thus the very negligence of a plaintiff, which would defeat his recovery for any primary negligence of the defendant, creates the condition (obliviousness) that makes the humanitarian rule applicable so as to place a duty upon the defendant out of which another cause of action arises for plaintiff when he is *approaching* a position of

imminent peril. A jury cannot know that unless they are clearly so told, and that is why I say that a plaintiff's instruction in such a case, which authorizes a verdict without requiring a finding of obliviousness, is erroneous and prejudicial. It is difficult enough to get a jury to understand how the humanitarian rule operates in *approaching* cases, and what widens the danger zone therein, when the instructions clearly state the essentials thereof. I think that failure to do so gives them the widest kind of roving commission and permits them to return a verdict upon pure guess, speculation and conjecture.

The judgment should be reversed and the cause remanded. *Frank, J.*, concurs.

ELLISON, C. J. (dissenting).—I dissent from the principal opinion, but since I am unable to agree with much of what is said in the dissenting opinion of GANTT, J., I write this separate dissenting opinion. As a basis therefor it seems necessary to consider briefly the history and nature of the humanitarian doctrine as now enforced in this State.

The whole last chance theory, as a separate doctrine, is less than a hundred years old, its origin being generally credited to Davies v. Mann, 10 M. & M. 546, 152 Eng. Reprint, 588, 19 Eng. Rul. Cas. 190, decided in 1842, where the defendant was held liable for damages occasioned by his negligently driving his wagon against the plaintiff's donkey, which the plaintiff had negligently left fettered in the public road. The first Missouri case on the subject seems to be Huelsenkamp v. Citizens' Ry. Co., 37 Mo. 537, 552, decided in 1866. That case was ruled purely on the last chance or proximate cause theory. It cites Davies v. Mann, supra, and quotes the following from a Vermont case: "Where there has been mutual negligence, and the negligence of each party was the proximate cause of the injury, no action whatever can be sustained. . . . So where the negligence of the plaintiff is proximate, and that of the defendant remote or consisting in some other matter than what occurred at the time of the injury, in such case no action can be sustained, for the reason that the immediate cause was the act of the plaintiff himself. . . . On the other hand, when the negligence of the defendant is proximate, and that of the plaintiff remote, the action can then well be sustained, although the plaintiff is not entirely without fault."

Many decisions followed along and the doctrine was expanded rapidly. Its application was not limited to railroads and street railways, but its development clearly was influenced by the fact that these transportation agencies operated "ponderous, death dealing machines" over the highways of the State and owed a very high degree of care to passengers. [See 46 Am. Law Review, 381, 386.] It was said in Murphy v. Wabash Railroad Co., 228 Mo. 56, 80, 128 S. W. 481, 485, decided in 1910, that some of our earlier Missouri cases

were founded on the doctrine of proximate and remote cause, some on the theory of comparative negligence, and some on the idea that the failure of the defendant to save the plaintiff from the consequences of his own negligence when reasonably possible, amounts to willful- ness, recklessness or wantonness; but that the later cases proceeded on principles of humanity, out of a tender regard for life and limb, and made the doctrine an *exception* to the law of contributory neg- ligence.

It is unnecessary, for the purposes of this case, to consider at length the origin and rationale of the rule. Discussions of those ques- tions will be found in 45 C. J., secs. 539-545, pp. 984-995; 20 R. C. L., sec. 10, p. 14, sec. 93, p. 107, secs. 114-117, pp. 138-144; 46 Am. Law Review, p. 381; 12 Law Series, Mo. Bulletin, p. 27; 92 A. L. R., p. 47, note. Suffice it to say the law became pretty well settled in Missouri that a plaintiff could recover under the humanitarian doctrine in spite of his own contributory negligence when he was in a position of imminent peril *and oblivious thereof or unable to extricate himself*; and the defendant knew, or in the exercise of reasonable care ought to have known, of such peril in time to have averted the injury by the exercise of reasonable care with the means at hand, without rea- sonable hazard to himself, his property, or others. The requirement that the plaintiff be oblivious of his peril or unable to extricate him- self was made because the law did not go so far as to excuse his con- tributory negligence when he knew of his peril and had it in his power to escape but nevertheless permitted the defendant negligently to injure him. The plaintiff "had no right to race with death that way," said the Laun case cited below. [Kinlen v. Met. St. Ry. Co., 216 Mo. 145, 164, 115 S. W. 523, 530; Laun v. St. L.-S. F. Railroad Co., 216 Mo. 563, 580, 116 S. W. 553, 557; Pope v. Wabash Railroad Co., 242 Mo. 232, 239, 146 S. W. 790, 792; Reeves v. K. C., St. L. & C. Railroad Co., 251 Mo. 169, 177, 158 S. W. 2, 4; State ex rel. St. L.-S. F. Ry. Co. v. Reynolds, 289 Mo. 479, 492, 233 S. W. 219, 223; Alexander v. St. L.-S. F. Ry. Co., 289 Mo. 599, 618, 233 S. W. 44, 48; Butler v. United Rys. Co., 293 Mo. 259, 268, 238 S. W. 1077, 1080; Hammond v. Emery-Bird-Thayer Dry Goods Co. (Mo. Div. 1), 240 S. W. 170, 174; Karte v. Brockman Mfg. Co. (Mo. Div. 1), 247 S. W. 417, 423 (5); Wenzel v. Busch (Mo. Div. 1), 259 S. W. 767, 770 (4).]

But the question frequently came up whether it was incum- bent on the plaintiff to *plead* his obliviousness or inability to extricate himself. It was held by the Kansas City Court of Appeals in Knapp v. Dunham, 195 S. W. 1062, that such allegations must appear in the petition. In 1922, Division One of this court in the Karte case, supra, 247 S. W. l. c. 423, ruled to the contrary—on the theory that if the plaintiff knew of his peril and could extricate himself, his cause of action would be defeated by his own contributory negligence; and that a plaintiff was not required to negative his own contributory

negligence in his petition by pleading a lack of such knowledge or ability to escape. · The same was held in the Wenzel case, supra (259 S. W. l. c. 770). These parts of the opinions in the Karte and Wenzel cases are quoted in the principal opinion in the instant case. The Wenzel case was decided in June, 1923, and a rehearing denied in March, 1924.

The same question was raised in Banks v. Morris & Co., 302 Mo. 254, 268, 257 S. W. 482, 485, decided by this court en banc in January, 1924.. This decision said the question was one of first impression in this State, evidently overlooking the Karte and Wenzel cases. However it ruled, as they had, that obliviousness and inextricability need not be pleaded by the plaintiff.—but for a vastly different reason. Whereas the Karte and Wenzel cases conceded these facts were essential, but held their absence must be urged as an affirmative defense, the Banks-Morris case declared the basic fact under the humanitarian doctrine is the plaintiff's imminent peril; and without noticing or overruling the long line of decisions supra, advanced the new theory that *it is immaterial what causes the peril, even though it be the plaintiff's own sheer hardihood or recklessness.*

The fact of obliviousness, said the Banks-Morris decision, is merely subsidiary evidence *in some instances* tending to establish the ultimate fact of imminent peril, which latter alone must be pleaded by the plaintiff in his petition. There was a separate concurring opinion by WHITE, J., joined in by DAVID E. BLAIR, J., which hedged on the principal opinion to the extent of suggesting that the plaintiff ought not to be permitted to recover under the humanitarian doctrine when he gets hurt on purpose, as in an effort to commit suicide or to collect insurance, but even this reservation was not concurred in by the five other judges.

This Banks-Morris case has become the leading decision in Missouri on the humanitarian doctrine, though occasionally there has been a reversion to the formula of prior decisions as in Phillips v. Henson, 326 Mo. 282, 289, 30 S. W. (2d) 1065,·1067, decided in 1930, where Division One of this court said: ''Defendant owed plaintiff no duty under the humanitarian rule until he saw or by the exercise of the highest degree of care could have seen him in a position of peril and either oblivious thereto or unable to extricate himself.'' And an examination of our cases will show that in many instances plaintiffs have since continued *from choice* to plead, prove and ask instructions on the theory that they were oblivious of peril or unable to extricate themselves, thereby avoiding the harsh rule of the Banks-Morris case, and recognizing the common sense and natural justice of the doctrine that a plaintiff ought not to be permitted to recover damages for self-invited personal injuries. In this way they have made a stronger appeal to juries.

Further expanding the doctrine, our courts have begun to depart from the rule that the plaintiff must be in a position of imminent peril to recover thereunder, and to hold that if he was *entering or going into* such position he could maintain his action, the other factual elements of the doctrine being proven to exist. One of the first cases of this kind was Boyd v. Wabash Western Ry. Co., 105 Mo. 371, 376, 16 S W. 909, 910, where the jury were instructed that if the trainmen ''saw Boyd in danger, or, by the exercise of reasonable care, prudence and watchfulness on their part, might have seen Boyd going into peril, under circumstances showing that he did not observe the near approach of the train, and the danger to which he was exposing himself,'' etc., then the plaintiff could recover. But it should be noted that this instruction coupled the statement about the deceased's going into peril with the further hypothesis that he was oblivious of his peril at the time, thus clearly making his position one of imminent peril.

Several recent cases, however, in declaring the doctrine operative in similar circumstances have not annexed the foregoing qualification: Elkin v. St. L. Pub. Serv. Co., 335 Mo. 951, 956, 74 S. W. (2d) 600, 603; Iman v. Freund Bread Co., 332 Mo. 461, 467, 58 S. W. (2d) 477, 480; Allen v. Kessler (Mo. Div. 1), 64 S. W. (2d) 630, 632 (1). In Montague v. M. & K. Interurban Ry. Co., 305 Mo. 269, 283, 264 S. W. 813, 817, an instruction was approved, which used the even broader phrase ''approaching a place of imminent peril.'' And in the instant case the principal opinion upholds an instruction authorizing a recovery by plaintiff (so far as concerns the point here under discussion) if ''at and prior to the collision'' the plaintiff was ''approaching and in a position of imminent peril.'' SHAIN, P. J., of the Kansas City Court of Appeals in a recent decision criticized such instructions as constituting a roving commission unless limited by a further requirement that the jury find the injured party also was oblivious of the threatening danger. [Lakin v. Chicago, R. I. & P. Ry. Co., 78 S. W. (2d) 481, 485.]

The humanitarian doctrine has been made more severe of late years in another respect that widely affects the people at large in motor vehicle cases. The use of automobiles has become universal. In 1921 a statute was enacted, Section 7775, Revised Statutes 1929 (Mo. Stat. Ann., p. 5197), requiring the operators of motor vehicles to exercise the highest degree of care in driving the same on the highways of this State. This requirement has been incorporated in our humanitarian doctrine. [Gude v. Weick Undertaking Co., 322 Mo. 778, 16 S. W. (2d) 59.] So now under the Banks-Morris case, to put a concrete illustration, if A and B, both driving automobiles on the public highway, collide, and A brings a suit under the humanitarian doctrine, he can recover damages from B on the bald admission that notwithstanding his own statutory duty to use the

highest degree of care, nevertheless he recklessly tried to pass in front of B's car though he saw B coming, knew of the danger, and could have avoided the collision. And this is true even though B was only guilty of the comparatively innocent dereliction of failing to see A in or approaching a position of imminent peril and thereafter to avert the casualty if, in the opinion of the jury, B could by exercising the highest degree of care have seen and acted in time to save A. We have gone to such lengths in expanding our so-called humanitarian or last chance doctrine that it is now sometimes facetiously referred to by lawyers from other jurisdictions as the "no chance doctrine," from the defendant's standpoint.

But instead of being a "no chance" doctrine it really is a "double chance" doctrine; for under it the adversary parties can recover against each other for the same casualty. It is not a mere question of which one gets his suit filed first. If two automobiles, street cars or trains of different ownership collide, in the action and cross-action following, each party may admit that he saw the other coming, knew of the danger, and could have avoided the collision, and still each can recover his damage from the other, if that other in the exercise of due care could have averted it. Each, in his action against the other is excused from the consequences of his own negligence proximately causing the collision, but in his defense against the cross-action of the other he is liable for that self-same negligence. Even under the old humanitarian doctrine requiring the complaining party to be either oblivious or unable to extricate himself, no damages could be awarded to either party on such evidence, and if we had the true last chance doctrine in this State such incongruities could not result at all.

 By necessary effect the Banks-Morris case has made a change in the law which is at war with the conclusion it announces. It holds that under the precepts of humanity and natural justice the humanitarian doctrine makes the plaintiff's imminent peril its chief basic fact; that is to say, the plaintiff must have been in *actual* imminent peril to recover thereunder. The decision cited in support of that pronouncement is State ex rel. Vulgamott v. Trimble, 300 Mo. 92, 106, 253 S. W. 1014, 1019; and that was the law in 1923 when the Vulgamott case was written, because then a plaintiff could not recover under the doctrine unless he was oblivious or unable to extricate himself. But these requirements were swept away by the Banks-Morris case and the rule established that a plaintiff's recovery will not be defeated whatever the cause of his "peril," be it even his own sheer hardihood or recklessness.

In other words, with knowledge of the danger and present ability to extricate himself the plaintiff can continue on into peril and collect damages if he gets hurt, provided the defendant in the exercise of due care could and should have seen his apparent peril in time to have saved him. But in such circumstances a normal person is

not in *actual* imminent peril practically so long as he can escape unaided. How close he may go to the source of the peril without cause for alarm is shown by a number of cases holding that when proceeding at an ordinary gait he does not enter the danger zone until he lacks only a step or two of coming within range of an oncoming street car or train; or he may even remain in front of it until it is drawing close to him. And in either case the defendant may assume he will get out of the way, and will not be held liable for his injury unless there was something to indicate he would not follow the instincts of self-preservation and avoid injury. [Keele v. A., T. & S. F. Ry. Co., 258 Mo. 62, 79, 167 S. W. 433, 438; Clark v. A., T. & S. F. Ry. Co., 319 Mo. 865, 879, 6 S. W. (2d) 954, 960; McGowan v. Wells, 324 Mo. 652, 664, 24 S. W. (2d) 633, 638; Cavey v. St. J. Ry., L., H. & P. Co., 331 Mo. 882, 885, 55 S. W. (2d) 438, 439; Worth v. St. L.-S. F. Ry. Co., 334 Mo. 1025, 1029, 68 S. W. (2d) 672, 673.]

This means, of course, that a person who is oblivious or intending to go into danger, but without giving indication of it, may be in actual imminent peril though not appearing to be. And yet, if his peril does not become apparent until too late to save him he cannot recover. On the other hand, it is equally true that a person may appear to be in imminent peril when he actually is not, as where he seems unable to extricate himself, or oblivious, or intent upon going into peril, but in fact is aware of the danger and ready, willing and able to avoid it. Cases of this sort are rare because ordinarily where one can escape one will do so and no lawsuit follows. But it is entirely conceivable that in such circumstances a last minute slip or rash misjudgment of timing or distance might result in injury. Under the Banks-Morris case, the rule is that the defendant must act whenever he sees or ought to see the plaintiff in imminent peril *for any reason.* And he must act upon appearances—upon the *first appearance* of such danger. If he fails to do so he is liable. [Burke v. Pappas, 316 Mo. 1235, 1244, 293 S. W. 142, 146; Gray v. Columbia Terminals Co., 331 Mo. 73, 81, 52 S. W. (2d) 809, 812; Martin v. Fehse, 331 Mo. 861, 866, 55 S. W. (2d) 440, 441; Womack v. Mo. Pac. Railroad Co., 337 Mo. 1160, 1167, 88 S. W. (2d) 368, 371.]

From all this it follows that the basic fact of the humanitarian doctrine under the present day rule is not the plaintiff's *actual* imminent peril; it is his *apparent* peril. Actualities have nothing to do with it. The first element in the formula of the Banks-Morris case, that the plaintiff be in a position of imminent peril, is simply the empty shell of the former but now discarded requirement that the plaintiff be oblivious of his peril or unable to extricate himself. Our law exacts absolutely nothing of the plaintiff. In my opinion this is not in accord either with natural justice or humanistic precepts. The primary obligation of every human being under all laws, Divine, secular and biological, is to protect himself from needless injury or

death. For us to say to the citizens of this State: "Go ahead, rush into danger needlessly, knowingly and recklessly, and if you get hurt the law will give you damages even though the other party was without guilty knowledge or bad intent and defaulted only in failing to exercise the degree of care legally imposed upon him,"—for us functuously to say this in the name of *humanity* is to profane the lofty principles we invoke.

While I have always thought the Banks-Morris case should be overruled, I have followed it as closely as any other member of this court (see McGowan v. Wells, 324 Mo. 652, 24 S. W. (2d) 633, an extreme case) and do not now want to appear to be submitting to it with ill grace, since a majority of the court adhere to it. But still I believe it is well for us to look back and see how far we have gone in the expansion of our humanitarian doctrine, preliminary to a consideration of the instruction under discussion in this case—respondent's Instruction No. 1, which submitted the case on the theory that "at and prior to the collision" the respondent was "approaching and in a position of imminent peril."

The appellant contends the instruction was erroneous in authorizing a verdict for respondent upon a finding that he was *approaching* a position of imminent peril, without requiring a further finding that he was then and there also oblivious of the threatening peril—this on the theory that so long as the respondent was only approaching a position of peril he was not actually in peril unless he was oblivious. The dissenting opinion agrees with that contention, holding that in such circumstances obliviousness is an essential element of the doctrine, and not mere subsidiary evidence as the Banks-Morris case says. I think that is true as a matter of evidence under the facts of this case, because there is no showing whatever in this record that the respondent knew of his danger and voluntarily entered into it. But I think such "approaching" instructions should not be given in any case; of that more later.

The principal opinion upholds the instruction on the theory of the Banks-Morris case that the plaintiff's imminent peril is the basic fact under the humanitarian doctrine, and that the plaintiff is not required to *plead* obliviousness, though it concedes (again quoting the Banks-Morris case) that the plaintiff must *prove* obliviousness when such proof is necessary to establish that he was *in* imminent peril. The opinion then proceeds to hold that since the respondent was not required to plead obliviousness the court was not required to instruct on it—in other words that the instruction need not be, in fact must not be, broader than the petition, quoting from Karte v. Brockman Mfg. Co., 247 S. W. l. c. 423, and Wenzel v. Busch, 259 S. W. l. c. 770.

The principal opinion errs in so holding. An instruction incorporating the element of obliviousness would not have ranged outside the petition, for a general allegation therein that the plaintiff was

in imminent peril would let in any evidence tending to prove that fact. Respondent's theory was that he got in the way of the train because he was oblivious. Until he had gone so far that he could not extricate himself his obliviousness was what made his position perilous. Under the express holding of the Banks-Morris case which the principal opinion quotes, it was therefore incumbent on respondent to prove obliviousness, insofar as he sought to recover on account of the appellant's negligence while he was *approaching* a position of imminent peril. Then why not instruct on obliviousness if such "approaching" instructions are proper at all? It does not follow that because a plaintiff may plead two necessary evidential elements as one ultimate fact, the court can give an instruction authorizing a verdict which embodies only one of those elements (approaching imminent peril) and omits the other (obliviousness) when both facts had to exist at the same time to put the plaintiff in imminent peril.

Nor do the Karte and Wenzel cases, supra, hold otherwise, though they do say the court need not instruct on obliviousness because the plaintiff need not prove it. But that was because those cases held disproof of obliviousness was an affirmative defense. In the instant cause proof of obliviousness was a part of the *respondent's* case to show his "approach" was imminently perilous. The principal opinion treats the instruction as if it submitted solely the issue whether the respondent was *in* imminent peril, and ignores the fact that the instruction also propounded the inquiry whether at and prior to the collision he was approaching a position of imminent peril. In other words, the principal opinion does not apply the same rule to both appellant and respondent. Answering the appellant's complaint that the instruction should have required the jury to find the respondent was oblivious, the opinion says it was only necessary for it to submit the ultimate fact of imminent peril; and yet the instruction does not similarly restrict the respondent's recovery to the ultimate fact of peril, but authorizes a verdict for him if he was *approaching* and in such peril.

I further agree with the dissenting opinion of GANTT, J., that the instruction is duplicitous and confusing, and should not have been given for that reason. It submits the proposition that at and prior to the collision the respondent was approaching and in a position of imminent peril. He could not have been *approaching* a position of imminent peril *at the time* of the collision; neither could he have been approaching imminent peril and in imminent peril at the same time. But if the instruction means anything it undoubtedly conveys the idea that the appellant owed him a duty while he was approaching imminent peril, and that is not the law under the Banks-Morris case. The criticisms of the instruction made in the preceding paragraphs are, therefore, well lodged.

The dissenting opinion concedes, however, that the instruction would have been proper if it had been clearly worded and had submitted the hypothesis that the respondent was approaching a position of imminent peril and at the time was oblivious of his peril. To this I do not agree. I think such instructions are prejudicially misleading. The injured party might be *approaching* imminent peril and oblivious of it for a long time or distance before he got *in* either actual or apparent imminent peril. The word "approaching" as used in that connection is too broad and vague. If the instruction had submitted the question whether the respondent was unknowingly "entering" or "about to go into" a position of imminent peril from which he could not escape unaided, it would have been less confusing. Such instructions have been upheld. Several cases so ruling are cited and discussed in State ex rel. Himmelsbach v. Becker, 337 Mo. 341, 85 S. W. (2d) 420, a banc decision written by the learned author of the principal opinion in this case. But it is to be noted that the Himmelsbach case criticizes instructions of this character, saying: "We believe that instructions which omit such phrases as 'approaching imminent peril' or 'entering into a position of peril' would not tend to confuse the jury."

But beyond all that is the fact that there are no degrees of imminent peril under the humanitarian doctrine. The plaintiff is either in peril or he is not. The defendant must act on the first appearance of imminent danger. The zone of peril may be enlarged by the plaintiff's obliviousness, fixed intent, or any other fact carrying him to injury if he continues, but that merely means he is *in* imminent peril that much sooner. If he is going into imminent peril and is oblivious of it because of obstructed view, blindness, deafness or inattention, or if he is dominated by a fixed intent, he is in danger at a given time and place as much as if he were physically unable to extricate himself. But in either case action by the defendant would be equally necessary to save him. So it is illogical as well as misleading to split up the question and require the jury to find whether the plaintiff was approaching or going into imminent peril, *and* oblivious or mentally deadlocked at the time. The sole issue hypothesized upon the evidence should be whether the plaintiff was *in* actual (or as I contend, apparent) imminent peril and the defendant knew or should have known it in time to save him.

In its discussion of such "approaching" instructions the dissenting opinion draws a distinction between a danger zone and a position of imminent peril, saying the former embraces that territory within which the plaintiff could escape the threatening danger by his own efforts if he knew of it, whereas the latter is a position of peril from which he does not have time or ability to escape solely by his own efforts. In other words, so long as he can save himself he is only in a danger zone; but when he cannot extricate himself he is in imminent peril.

This is contrary to all our decisions up to now. True enough the expression danger zone has been more frequently used objectively as referring to the area within which the plaintiff's peril could and should have been known and acted upon by the defendant; and the expression position of imminet peril is usually employed subjectively, as signifying the peril itself. But it has never been said before that a plaintiff is not in imminent peril unless he cannot extricate himself. For general purposes the two expressions have always been regarded as synonymous. [Keele v. A., T. & S. F. Ry. Co., 258 Mo. 1. c. 79, 167 S. W. 1. c. 438; State ex rel. Himmelsbach v. Becker, 337 Mo. 1. c. 347, 85 S. W. (2d) 1. c. 423.] There are probably scores of cases holding a plaintiff was in imminent peril because of his obliviousness, which of course means he could have escaped by his own efforts if he had known of the danger. [For instance, see Mayfield v. K. C. So. Ry. Co., 337 Mo. 79, 85, 85 S. W. (2d) 116, 120; Borgstede v. Waldbauer, 337 Mo. 1205, 1213, 88 S. W. (2d) 373, 376.] And as I have already attempted to show, the fact of plaintiff's *apparent* peril alone is enough to put the defendant on notice and guard; that is to say, when he is in the danger zone he is in imminent peril so far as the defendant's duty is concerned.

The dissenting opinion refers to Sections 479 and 480 of the Restatement of the Law of Torts as supporting the distinction it draws between being in a danger zone and being in a position of imminent peril. The two sections do not make a distinction, but they proceed on the last clear chance theory and not under our humanitarian doctrine, which permits a plaintiff to recover for an avoidable self-invited injury although the defendant had no actual knowledge of his situation. Section 479 of the Restatement applies only when the plaintiff was physically unable to extricate himself, and the defendant knew and realized or in the exercise of due vigilance should have known and realized the plaintiff's helpless peril, and thereafter failed to exercise due care and competence to save him when he might have done so. Section 480 of the Restatement applies when the plaintiff could have saved himself and the defendant knew of the plaintiff's situation and realized or should have realized the peril he was in, but negligently failed to take steps which would have averted the injury.

I maintain that we have already gone too far with our humanitarian doctrine in this State and that we ought not to go still further, as is proposed in the principal opinion in this case, by holding a defendant liable merely because he ought to have seen the plaintiff at and prior to the injury approaching and in a position of imminent peril (and negligently failed thereafter to avert the injury when he could have done so.)